**Supreme Court**

No. 2011-346-C.A.

(P2/09-2975A)

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| James Gaffney. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.              :

James Gaffney.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court on March 6, 2013, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. The defendant, James Gaffney, was charged with two counts of felony assault in violation of G.L. 1956 § 11-5-2. The defendant appeals from a judgment of conviction after a jury verdict finding him guilty of the lesser-included offense of simple assault (count 1) and of a "serious bodily injury" felony assault (count 2).[1] On March 23, 2011, the trial justice heard and denied the defendant's motion for a new trial. The defendant was sentenced to serve one year at the Adult Correctional Institutions on count 1[2] and to a concurrent fifteen-year sentence on count 2, with five years to serve, the balance suspended, with probation. On appeal, the defendant argues that the trial justice erred by denying his motion for judgment of acquittal and his motion for a new trial.

---

[1] Although defendant filed his notice of appeal prior to the October 21, 2011 entry of judgment, we treat the appeal as though it had been filed after the entry of judgment, in accordance with Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure. See State v. Baillargeron, 58 A.3d 194, 197 n.5 (R.I. 2013) (citing Azevedo v. State, 945 A.2d 335, 337 n.4 (R.I. 2008)).

[2] That sentence was to be retroactive to November 3, 2010 because defendant was imprisoned on November 3, 2010 after he was found to be a bail violator.

After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time. We affirm the judgment of conviction.

**Facts and Travel**

At trial, the complainant, April Meneses (Meneses), testified that, on June 10, 2009, she was visiting at defendant's Woonsocket, Rhode Island apartment for much of the day and night. According to Meneses, she had known defendant for about ten years: he was a close friend, an "[o]ff and on" love interest, and she frequented his apartment almost daily in order to drink vodka and beer and smoke crack cocaine. Meneses testified that, on June 10, 2009, she arrived at defendant's apartment at 11 a.m. and stayed throughout the day; during the course of that visit, she and defendant smoked "a lot" of crack cocaine and each made a trip to the liquor store.

Meneses testified that, beyond those basic details, she had no memory of the events that unfolded. In fact, Meneses indicated that she woke up on her sister's couch—at some indefinite time after June 10—with a swollen face, bruised eyes and neck, a lump on her forehead, staples in the back of her head, and various other bruises covering her body, but she had no recollection of how she had suffered any of those injuries.

The defendant's neighbor, Gina Trahan (Trahan), next testified; she explained how she awoke to a loud disturbance, emanating from defendant's apartment, between 5 and 6 a.m. on June 11, 2009. She indicated that the walls in the apartment building were "[v]ery thin" and, as a result, she could hear people talking in neighboring apartments. Trahan testified that "[she] was awakened to what sounded like furniture being thrown up against the wall, and screaming, yelling, crying." She added that she "heard a woman crying, and [she] heard her yelling, 'Help

me.'"[3]  According to Trahan, "[she] knew someone was being very badly hurt in that apartment at that time."  Because he had lived in the neighboring apartment for about two years, defendant's voice was recognizable to Trahan; she identified defendant's voice as one of the two voices she heard in the apartment that morning.  Trahan also testified that she knew Meneses "a little bit" because Meneses regularly visited defendant at the apartment; Trahan identified Meneses' voice as the one yelling, "Help me."

According to Trahan, she went into the hallway and put her ear "up against the door right before [she] called 9-1-1."  After she called 9-1-1, Trahan heard defendant say, "[s]omeone's going to call the police."  After she let the police into the building, Trahan "saw [Meneses] actually fall out of her apartment door, * * * on the floor. * * * [Trahan] saw blood all over the back of her head, and [she] saw blood actually fly across the hallway * * *."

Officer David Wahl (Officer Wahl) testified that he saw defendant—whom Officer Wahl described as looking "a little agitated"—at the door to the apartment building, beyond the security door but before the sliding outside door.  Officer Wahl noted that defendant had "blood on his hands."  As he entered the building, Officer Wahl found Meneses on the floor, face-down and bleeding from the back of her head.  According to Officer Wahl, Meneses was crying and screaming for help; she also said, "I'm dying.  Call my grandma."  Officer Wahl observed that there were no signs of forced entry, but he indicated that he saw bloodied pieces of concrete on the floor of the apartment as well as broken pieces from the base of a lamp.

Similarly, Officer Michael Martufi (Officer Martufi) testified that, when he arrived, he noticed blood on defendant's thumb, clothes, and socks.  Unlike Officer Wahl, however, Officer

---

[3] Trahan later elaborated, stating that "it sounded like someone hit a wall.  And as soon as [Trahan] heard that sound, [she] would hear her crying out."  Trahan explained, "it wasn't like she was crying softly.  It was like a screaming crying. * * * It sounded like someone was being killed."

Martufi described defendant as appearing "pretty calm" and "very nonchalant," although he did stutter and speak quickly. Officer Martufi also testified that he observed "chunks" of what appeared to be ceramic material in Meneses's hair; these "chunks," according to Officer Martufi, seemed to have been part of the base of the nearby broken floor lamp. As for Meneses's demeanor, Officer Martufi described her as "out of it," panting, crying, screaming, and trying to crawl.

The state's final witness was Jessica Sevigny (Sevigny), a registered nurse on duty at Landmark Medical Center (Landmark) when Meneses arrived for emergency treatment. Sevigny testified that, upon arrival, Meneses was "tachycardic, tachypnea and hypertensive." In other words, "[h]er heart rate [was] over a hundred, her respiratory rate [was] over 120, and * * * her blood pressure was 120 over 80." Further, Sevigny indicated that Meneses had black and blue "raccoon eyes." These observations, along with Meneses's vital signs, suggested to the witness that Meneses had suffered an injury severe enough to result in "bleeding into her brain," which could cause her to "stop breathing" or possibly undergo "cardiac arrest." Sevigny noted that she was most concerned about the head injury; Meneses's black and blue eyes were indicative of a possible skull fracture. As a result, her status was deemed "critical," and her family was contacted. Sevigny testified that Meneses was "yelling out, screaming, combative" during this time. She also indicated that "there was lots of blood" and that, when asked what happened, Meneses stated that "she got hit in the back of the head * * *."

Sevigny testified that a CT scan was conducted "quickly" to eliminate the possibility of a head injury and bleeding into the brain, either of which, if found, would require treatment at Rhode Island Hospital. The scan included Meneses's face, head, and neck. The results of the scan revealed that there was in fact no bleeding into the brain, no broken bones, and no injuries

to Meneses's neck; Meneses's head lacerations were then "cleaned and stapled" with six staples to the back of her head.[4]

After the state rested its case, defendant moved for a judgment of acquittal on both counts. With regard to defendant's argument on count 2—the only count he challenges before this Court—defendant argued that the testimony presented was insufficient to prove serious bodily injury under any of the relevant statutory criteria. However, based on Sevigny's testimony, the trial justice denied the motion. Specifically, the trial justice found that Sevigny's description of Meneses's appearance at the time of her arrival at Landmark for treatment was sufficient to prove that her physical injuries created a substantial risk of death. Further, the trial justice determined that Sevigny's testimony that the staples in Meneses's head would leave scarring—and "sometimes hair doesn't grow over that scar"—was sufficient to prove that Meneses's physical injuries caused a serious permanent disfigurement.

After defendant rested his case without taking the stand or presenting any evidence, he renewed his motion for a judgment of acquittal. The trial justice reserved her ruling as to that motion.

The jury found defendant guilty of the lesser-included offense of simple assault and battery on count 1 and guilty on count 2 of assault and battery, resulting in serious bodily injury. The defendant immediately moved for a new trial with respect to count 2, felony assault, arguing that "the verdict [was] against the greater weight of evidence." Additionally, at a March 23, 2011 hearing, defendant argued that there was insufficient evidence to support the charge of

---

[4] Sevigny testified that stapling the head leaves "a scar, and no hair grows there." On re-direct examination, in response to the state's question, "And you said [stapling] causes scarring on the back of the head?" Sevigny responded, "Yes." The state followed this answer by asking, "Where you don't actually grow hair, correct?" and Sevigny replied, "Yeah, sometimes."

felony assault and, further, that the state failed to prove that Meneses's injuries constituted serious bodily injury as defined by the statute.

The trial justice delivered her decision from the bench. In so doing, she found that the state's witnesses were credible: Meneses was "limited in her testimony," but credible; Trahan, essentially "an eye witness" to the assault, was "very credible," "presented well," and "was a good witness"; "[t]he two police officers substantiated the injury, the assault and the condition" of Meneses; "[Sevigny] talked about the injury that, in fact, occurred"; and, overall, they were "all credible witnesses." As to the evidence, the trial justice "found the evidence to be credible[.]" In addressing the sufficiency of the evidence as to the supplemental motion for new trial and the reserved motion for judgment of acquittal, the trial justice concluded that "the assault that [Meneses] sustained, and the testimony of [Sevigny] justifies a finding of the assault causing serious injury." Furthermore, "look[ing] at the standard which is that which creates a substantial risk of death," the trial justice determined "that the testimony gives the jury that evidence for them to consider."

On appeal, defendant argues that the testimony adduced at trial did not establish that Meneses's injuries created a substantial risk of death. The defendant points to the CT scan finding that there was no bleeding into Meneses's brain, or a skull fracture, or neck injuries, and argues that there was no meaningful connection between Meneses's head wound and her critical condition upon arrival at the hospital. The defendant suggests that her elevated vital signs were symptomatic of her use of drugs.[5] He therefore contends that, "even looking at the evidence in the light most favorable to the state, the evidence failed to prove beyond a reasonable doubt that any injuries inflicted by [defendant] created a substantial risk of death."

---

[5] There was no evidence of this connection with drugs in the record.

Meanwhile, in support of his contention that there was insufficient evidence that Meneses's injuries caused serious permanent disfigurement, defendant argues that there was no evidence that Meneses has a resulting permanent mark or scar, and that Sevigny testified that staples may "sometimes" cause scars where hair does not grow. The defendant relies on State v. Clark, 974 A.2d 558, 573 (R.I. 2009) for the proposition that a "serious permanent disfigurement" requires "an everlasting disfigurement * * * that is grave and not trivial in quality or manner." Here, according to defendant, there was no evidence that the staples in Meneses's head left any permanent scars, and thus, there was no evidence to support a finding of serious permanent disfigurement.

**Standard of Review**

The defendant argues that the trial justice erred when he denied his motions for a judgment of acquittal[6] and for a new trial.[7] This Court has explained that "prevailing on an acquittal motion is a heavier burden for a defendant because the trial justice 'must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt.'" State v. Pineda, 13 A.3d 623, 640 (R.I. 2011) (citing State v. Cardin, 987 A.2d 248, 250 (R.I. 2010)); see also State v. Caba, 887 A.2d 370, 372 (R.I. 2005).

"[W]hen confronted with a challenge to the sufficiency of the evidence by way of a new-trial motion, it is incumbent upon the trial justice to review the evidence and decide whether, as a

---

[6] Rule 29 of the Superior Court Rules of Criminal Procedure states that a motion for a judgment of acquittal may be made at the close of the prosecution's case and also at the close of all evidence.

[7] This Court has held that a criminal defendant may move for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure on the basis that the evidence legally is insufficient to support a verdict of guilty beyond a reasonable doubt. See State v. Clark, 974 A.2d 558, 570 (R.I. 2009) (citing State v. Lynch, 854 A.2d 1022, 1045-46 (R.I. 2004)); see also State v. Colbert, 549 A.2d 1021, 1023 (R.I. 1988).

matter of law, the evidence legally is sufficient to support a verdict of guilty beyond a reasonable doubt." Clark, 974 A.2d at 570. Faced with such a challenge, "[a] trial justice must examine the evidence * * * without assessing the weight of the evidence or the credibility of the witnesses," and "draw all reasonable inferences consistent with guilt, mindful that the jury likewise has done so." Id.; see also State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011). The motion must be denied "[i]f the trial justice determines that any rational trier of fact could have found that the prosecution established the elements of the crime beyond a reasonable doubt[;]" "conversely, if the trial justice grants the motion, it is tantamount to a judgment of acquittal and retrial is barred by double jeopardy." Karngar, 29 A.3d at 1235 (citing Clark, 974 A.2d at 569, 571).

"This Court reviews the trial justice's decision de novo; we examine the evidence in the light most favorable to the verdict which has been returned by the jury." Clark, 974 A.2d at 571 (citing United States v. Paret-Ruiz, 567 F.3d 1, 5 (1st Cir. 2009)). "We will not overturn a guilty verdict 'unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered [it].'" Id. (quoting Paret-Ruiz, 567 F.3d at 5).

When simultaneously faced with a defendant's challenge to the trial court's rulings on a motion for judgment of acquittal and motion for new trial, as in the case before us on appeal, this Court first conducts a review of the new-trial motion. See State v. Cardona, 969 A.2d 667, 672 (R.I. 2009). Indeed, "[b]ecause both of defendant's motions raised the same challenge to the [legal] sufficiency of the evidence," we begin our review by "conduct[ing] the more exacting analysis required for review of a ruling on a motion for a new trial."[8] Id.

---

[8] We pause to note that, at the hearing on the motion for new trial, defendant also advanced the argument that the verdict was against the greater weight of the evidence. "When a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." State v.

**Discussion**

**Motion for New Trial**

On appeal, defendant argues that the state's evidence was insufficient as a matter of law to sustain a conviction for felony assault. More specifically, defendant contends that the evidence as to count 2 was "legally insufficient to support a verdict of guilty of felony assault by causing serious bodily injury * * * and that the trial justice should have granted [his] motion[s] * * * based on the insufficiency of the evidence as to this count."

In this case, the criminal information charged defendant with committing a felony assault which resulted in serious bodily injury in accordance with the definition set forth in § 11-5-2. Section 11-5-2—"Felony assault"—provides, in pertinent part:

> "(a) Every person who shall make an assault or battery, or both, * * * which results in serious bodily injury, shall be punished by imprisonment for not more than twenty (20) years.
>
> "* * *
>
> "(c) 'Serious bodily injury' means physical injury that:
>
> "(1) Creates a substantial risk of death;
>
> "(2) Causes protracted loss or impairment of the function of any bodily part, member or organ; or
>
> "(3) Causes serious permanent disfigurement * * *."

The defendant argues that the evidence did not "establish either a substantial risk of death or serious permanent disfigurement."[9] The defendant contends that, "even looking at the evidence

Paola, 59 A.3d 99, 104 (R.I. 2013) (quoting State v. Smith, 39 A.3d 669, 673 (R.I. 2012)); see also Clark, 974 A.2d at 569. Because defendant is not pressing this claim on appeal, we need not address it any further.

[9] Neither party argues the "protracted loss or impairment of the function of any bodily part, member or organ" language of the statute. Therefore, we need pass upon only subsections (1) and (3) of G.L. 1956 § 11-5-2(c).

- 9 -

in the light most favorable to the state, the evidence failed to prove beyond a reasonable doubt that any injuries inflicted by [defendant] created a substantial risk of death[.]" Likewise, defendant argues that "there simply was no evidence which could support a finding of serious permanent disfigurement."

We begin our analysis by noting that the beating Meneses suffered at the hands of this defendant, during an assault at his home, was quite brutal. The witnesses described chunks of ceramic material near the bleeding head wound. Other witnesses testified to substantial bruising and significant amounts of blood. With that testimony in mind, we turn to the "substantial risk of death" prong of § 11-5-2. When the trial justice assessed "substantial risk of death," she focused her analysis on the evidence of Meneses's injuries from the vantage point of the medical professionals who treated her at Landmark. Specifically, the trial justice found that the visible injuries—"raccoon eyes," head laceration, and elevated vital signs—rendered Meneses in "critical" condition such that the jury could have found a substantial risk of death from the beating and its resultant injuries. Ultimately, the trial justice relied on these findings when she concluded that the state had presented sufficient evidence to demonstrate a "serious bodily injury." We discern no error in that conclusion.

Section 11-5-2 focuses on the conduct of a defendant and whether his or her assault upon another "results in serious bodily injury," that is, results in a "physical injury" that "[c]reates a substantial risk of death." Section 11-5-2(a), (c)(1). The statute does not require that the victim of the assault be rendered objectively or clinically at risk of death. Rather, the statute frames the issue as whether the conduct of a defendant, in assaulting the victim, "[c]reates a substantial risk of death." Section 11-5-2(c)(1). Here, the issue is whether a savage beating causing substantial bleeding, "raccoon eyes," abnormal and elevated vital signs, and a head wound requiring six

staples created a substantial risk of death.

Taken as a whole, the totality of the evidence of this brutal assault—including the multiple blows to Meneses's head, the resultant bleeding and bruised "raccoon eyes," her elevated vital signs, combined with the classification of Meneses as "critical" upon her arrival at Landmark, and Landmark's response to the injuries as life-threatening—is sufficient evidence for a jury to conclude there was a substantial risk of death. Indeed, the risk of death was considered substantial enough that Landmark's medical staff contacted Meneses's family. These readily apparent signs of injury were indicative of a variety of life-threatening conditions, such as a skull fracture, brain bleed, spine injury, and the risk of cardiac arrest. Accordingly, in light of the evidence concerning the multitude as well as the extent of the injuries Meneses sustained, we are satisfied that a jury properly could conclude that this beating created a risk of death to Meneses as required by § 11-5-2. Indeed, we cannot say as a matter of law that the jury could not reasonably have found that Meneses suffered a "serious physical injury." We conclude that the "serious physical injury" component of the statute satisfactorily was demonstrated and that, accordingly, there was sufficient evidence adduced to support a conviction of felony assault.

Because we affirm the trial justice's decision on the sufficiency of the evidence, we do not reach the question of whether the evidence presented was sufficient to support a finding of serious permanent disfigurement.

### Motion for Judgment of Acquittal

Our decision with respect to the defendant's motion for new trial renders any analysis of the denial of his motion for judgment of acquittal unnecessary. See Cardona, 969 A.2d at 672 (noting that, when this Court at once faces a defendant's challenge to the trial court's rulings on

- 11 -

motions for new trial and judgment of acquittal, this Court first conducts "the more exacting analysis required for review of a ruling on a motion for a new trial").

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. James Gaffney.

**CASE NO:**        No. 2011-346-C.A.
                            (P2/09-2975A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   April 23, 2013

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                            Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

                            For State:  Virginia M. McGinn
                                        Department of Attorney General

                            For Defendant:  Janice M. Weisfeld
                                        Office of the Public Defender