State                    :

    v.                   :

Jason Nickerson.         :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State               :

     v.             :

Jason Nickerson.      :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   The defendant, Jason Nickerson (defendant or Nickerson), is before the Supreme Court on appeal from a judgment of conviction on four counts of first-degree sexual assault, in violation of G.L. 1956 § 11-37-2, and one count of felony assault and battery, in violation of G.L. 1956 § 11-5-2.  The defendant argues that the trial justice erred in denying his motion for judgment of acquittal and his motion for a new trial, claiming that the state failed to prove that he was the perpetrator of these crimes.  The defendant also argues that, in violation of his constitutional rights and Rule 16 of the Superior Court Rules of Criminal Procedure, the trial justice erred in denying the defendant's motion to exclude the testimony of a forensic evidence analyst who testified at trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**Facts and Travel**

In June 2007, sixteen-year old Emma[1] was living in a motel room in South Attleboro, Massachusetts, with her alcoholic parents and younger sister.  The family had moved to the

---

[1] To protect her privacy, the complainant has been given a pseudonym.

motel after Emma became involved in a physical altercation with a cousin, causing her family to leave the home they were sharing with Emma's aunt and cousins. At the time, Emma had dropped out of high school, but was working to obtain a GED; she also worked part-time at a fast-food restaurant in Pawtucket, Rhode Island. Emma was on probation at the time, with an 8 p.m. curfew that had been imposed by the Family Court as a result of her having been reported missing to the police several times.

Despite this curfew, however, on June 30, 2007, Emma's mother drove her to a friend's house near Miriam Hospital in Providence at around 10 p.m., with the understanding that she would return for her later that evening. Emma and her friend watched television, played video games, and smoked marijuana. After a few hours, Emma repeatedly and unsuccessfully tried to contact her mother for the promised ride back to the motel. Receiving no response, Emma made the fateful decision to walk from Providence to South Attleboro.[2]

Emma had been walking on North Main Street toward Pawtucket for about ten minutes when a car pulled up beside her and the driver asked if she needed a ride. Emma described the driver as a dark-skinned male who was bald, between 6'2" and 6'4" tall, and weighed over two hundred pounds; she also noted the man's pointy noise, a distinguishing feature that she "had never seen [on] a person of his [African-American] race." According to Emma, she was apprehensive about getting into the car with the stranger, and asked the man "[a]re you going to hurt me? Is everything going to be all right?" The man responded "[y]es, I'm not going to hurt you, everything will be all right." Emma—discouraged by the long walk ahead of her—accepted what she thought to be "a nice gesture," and got into the car.

---

[2] Although she testified that "[i]t's kind of ridiculous" to walk from Providence to South Attleboro, and that the trek would take a "few hours," Emma admitted that she "didn't have any other way to get there besides walk" and "[t]o me, it wasn't serious because [walking] was something I did all the time to get to wherever I needed to go."

As they drove, the man asked her name, and Emma, deciding that her real name was none of his business, told him her name was Jasmine.  He also asked if she smoked marijuana, and she disclosed that she had some with her.  According to Emma, the man then drove to a parking lot in Pawtucket in order to smoke the marijuana; however, the presence of people nearby made the man uncomfortable and they left.  The man then drove through a maze of side streets until Emma realized that the car was no longer traveling toward the motel.  When Emma voiced her concerns, the man explained that they were going to his house to smoke the marijuana.

The car, however, came to a stop in a small parking area—surrounded on three sides by a chain link fence—where the man tried to kiss Emma.  When she resisted, the man forced her to kiss him; he bit her collarbone and began to pull off her pants.  Emma testified that the man continuously hit her in the face as she struggled and tried to escape.  According to Emma, the man began to penetrate her vagina with his fingers, and forced her to perform oral sex.  She attempted to escape by crawling into the backseat, but the man climbed on top of her and penetrated her both vaginally and anally.  Emma testified that as she tried to escape from the backseat the man choked her until she almost lost consciousness.  Emma testified that, at one point during the attack, she felt a knife against her ribs and realized that resistance was futile.  She stopped struggling and began pleading with the man to let her go.

When the ordeal ended, the man took a towel and wiped her thoroughly in the vaginal and anal areas where he had ejaculated.  He took her cell phone from her purse and removed the battery; he gave Emma the phone, but refused to return her purse.  The man started the car, at which point Emma noticed that it was almost 4 a.m.  He then ordered Emma to get out of the car and lie face down on the ground, threatening to back the car over her if she looked at him, his vehicle, or his license plate.  He also threatened to kill her and her family if she reported the

- 3 -

incident to police.

After the man drove away, Emma stood up and ran toward the street. A woman driving by asked Emma if she needed help, and offered her a ride. Emma accepted and told the woman what had happened to her; however, she refused the woman's attempt to go to the police station, insisting that she go home to be with her family.[3] When the woman was unable to find the motel where Emma's family resided, she left Emma at a Walgreens store in Pawtucket with enough money to buy water. Emma was met there by Pawtucket Police Officer Richard LaForest (Det. LaForest),[4] who was responding to a report—from a woman who went to the Pawtucket police station—suggesting that the police check on the well-being of an injured woman at Walgreens.[5] Emma disclosed to Det. LaForest that she had been raped, and, despite Emma's desire to return home, an ambulance was summoned to transport her to Hasbro Children's Hospital.

At the hospital, Emma was seen by Dr. Amy Goldberg (Dr. Goldberg), a specialist in child abuse pediatrics. According to Dr. Goldberg, it was immediately apparent that Emma "had very obvious physical trauma," to her face and neck; Emma's left eye was swollen shut, there was a cut on her mouth, and her neck was red and swollen. Emma told Dr. Goldberg that she had been physically and sexually assaulted by a man who penetrated her vaginally, anally, and orally over a period of about three hours, and explained that when she tried to resist, her assailant punched her in the face and body, and he bit her and choked her almost to the point of unconsciousness.

---

[3] Despite her unstable home environment, Emma testified that following the attack she just wanted to be at home with her family, craving "some sense of closeness" in the aftermath of her ordeal.

[4] At the time of the incident, Det. LaForest held the rank of patrolman.

[5] The woman who picked up Emma and presumably reported the incident to the Pawtucket police was never identified.

Doctor Goldberg testified that her examination was consistent with Emma's description of the assault; it revealed extensive bruising and petechial hemorrhaging—which occurs when vessels in the skin release blood due to pressure or trauma—on Emma's face. Doctor Goldberg testified that the pervasive petechial hemorrhaging around Emma's eyes and neck corroborated the girl's account of being choked. Additional petechial hemorrhaging was evident on Emma's back, and Dr. Goldberg noted bruising and "suction" injuries on Emma's chest, consistent with Emma's claim of having been bitten by the assailant. According to Dr. Goldberg, all of Emma's injuries were recently inflicted.[6]

Doctor Goldberg also conducted a genital examination, noting that except for the area outside of her vagina, which exhibited erythema, or extreme redness, the examination was normal. Doctor Goldberg explained that erythema was consistent with trauma; however, she noted that there was no bleeding, tearing, fissures, or other acute signs of traumatic injury to the vaginal or anal areas. According to Dr. Goldberg, such observations did not conflict with Emma's account of having been sexually assaulted, because girls of Emma's age are "fully estrogenized," which makes vaginal tissue "extremely lubricated, thick and flexible." It is for this reason, Dr. Goldberg clarified, that outward signs of genital trauma are uncommon and exhibited in no more than 5 to 10 percent of sexual assault cases. The doctor further explained that signs of damage to the anal cavity are even more rare, with no physical manifestations in more than 99 percent of sexual assaults involving anal penetration.

Doctor Goldberg also collected various biologic samples to include in a forensic evidence

---

[6] Doctor Goldberg testified that although she photographed Emma's injuries during the examination conducted in the early morning hours of July 1, 2007, those photographs were unavailable at trial due to a technical computer issue. During her testimony, Dr. Goldberg instead referenced photographs taken during Emma's follow-up examination on July 2. Doctor Goldberg, however, testified that during the initial examination, Emma's injuries appeared "much more severe" than what was depicted in the photographs admitted into evidence.

- 5 -

collection kit, including swab samples from inside Emma's mouth, vagina, and rectum. Emma's clothes were collected and placed into a bag, except for her underwear, which was placed in a separate bag. The forensic evidence kit was later examined by Sharon Mallard (Mallard), a forensic scientist at the Rhode Island Department of Health Laboratory. Mallard noted five visible stains on the underwear, and further testing of the garment revealed the presence of sperm. A small amount of sperm also was detected on both the vaginal and rectal slides, which were created by swiping the corresponding swab across a single slide.[7]

The evidence kit was then sent for DNA testing to ReliaGene Technologies lab in New Orleans, Louisiana, where it was tested by forensic DNA analyst Teresa-Lynne Jones (Jones). A cutting from Emma's underwear confirmed the presence of sperm cells and yielded a DNA profile from a single, unknown male. The swabs and slides contained in the evidence kit were not tested for DNA, and it was only the biological material from Emma's underwear that Jones used to develop the DNA profile. This DNA profile, developed solely from testing conducted on the underwear, was submitted to the Combined DNA Indexing System (CODIS) on November 19, 2007, but there were no matches with anyone registered in the system at that time. Notably, a cutting from Emma's underwear was the only clothing submitted to ReliaGene for testing. The other garments that Emma was wearing were transferred from the Department of Health to the Providence Police Department, where it subsequently was lost after an evidence viewing session by defense counsel and a paralegal from the Office of the Attorney General.[8]

---

[7] Mallard testified that, because the slides and underwear revealed the presence of sperm, the other articles of clothing that Emma was wearing at the time of the attack were not tested. She explained that this was according to protocol; had the results from the samples in the evidence kit come back negative, further testing would have been conducted.

[8] Detective John Muriel, who examined the garments before they went missing, later testified that he did not notice any obvious damage to the clothing, such as tears or bloodstains.

The police investigation conducted after the assault also produced no leads. On July 2, 2007—the day after the incident—Providence Police Det. John Muriel (Det. Muriel) interviewed Emma. Detective Muriel drove with Emma through various neighborhoods in Providence attempting to locate the crime scene, without success. Emma also was shown a photo array of six photographs, but was unable to identify any of the men as her attacker. One week later, Emma and Det. Muriel again drove around various neighborhoods in Providence, and this time Emma was able to identify a parking lot near Cranston Street as the location where the attack occurred. Detective Muriel's attempts to speak with any occupants of the homes adjoining the lot were unsuccessful.

Time passed. In July 2009—two years after the attack—Det. Muriel showed Emma a second photo array; again, she was unable to identify any of the subjects as her attacker. In January 2011, the Providence police were notified that there was a match between the DNA sample produced from Emma's evidence kit and a DNA profile recently submitted to CODIS. The suspect was identified as Jason Nickerson (Nickerson or defendant). Upon receiving this information, Det. Muriel attempted to locate Emma, and on March 9, 2011—almost four years after the attack—Det. Muriel showed Emma yet another photo array, this time containing a picture of Nickerson. However, Emma did not identify any of the men in the photo array.

Detective Muriel proceeded to obtain a search warrant and perform a buccal swab on Nickerson, who was being held at the Adult Correctional Institutions (ACI) on an unrelated charge. Detective Muriel delivered the swab to the Rhode Island Department of Health laboratories, where Cara Lupino (Lupino), supervisor of forensic biology and DNA laboratories, tested the sample. In accordance with the lab's protocol, Lupino first retested the original sample that was taken from the forensic evidence kit, and obtained the same result. Next,

Lupino tested the buccal swab obtained from Nickerson pursuant to the search warrant. After comparing the two samples, Lupino concluded that the profile developed from the sample taken from Emma's underwear matched the profile developed from Nickerson's buccal swab to a probable certainty of one in 5.6 quadrillion people, which Lupino explained was one in a million times the earth's population.

Nickerson subsequently was indicted on seven felony counts, including four counts of first-degree sexual assault in violation of § 11-37-2, consisting of penile-vaginal penetration (count 1), digital-vaginal penetration (count 2), penile-anal penetration (count 3), and fellatio (count 4). Nickerson was also charged with assault with a dangerous weapon—namely, choking with hands—in violation of § 11-5-2 (count 5); second-degree robbery in violation of G.L. 1956 § 11-39-1 (count 6); and assault with a dangerous weapon—a knife—in violation of § 11-5-2 (count 7).

A jury trial commenced on April 2, 2012. At trial, Nickerson testified on his own behalf and gave a widely divergent account of his encounter with Emma. Nickerson admitted that he had sexual relations with Emma; however, he claimed that it was a consensual encounter that did not occur on the day that Emma was brutally attacked. According to Nickerson, on a weekday afternoon the week before the assault, he was driving on Main Street in Pawtucket—in an area he claimed is known for prostitution—when he saw a young woman dressed in tight-fitting, provocative clothing. Assuming the woman was a prostitute, Nickerson testified that he stopped and asked the woman how she was doing, and told her that she looked cute. Nickerson testified that the woman leaned into the car and told him that she was looking to make some money. Nickerson, who testified that he had engaged the services of a prostitute on at least two previous

occasions, invited the woman into the car.[9]

Nickerson claimed that after driving for two to three minutes, he drove into an alley, where the woman told him her name was either Jackie or Jasmine and that it would cost $20 for oral sex or $60 for vaginal intercourse. Nickerson testified that he paid the woman $60, at which point he moved to the backseat of the vehicle and the woman climbed over the front seat into the backseat, and proceeded to unbutton and unzip his pants. He testified that she then performed oral sex for approximately five minutes.[10] Nickerson testified that the woman then removed her pants and underpants, and the two engaged in vaginal intercourse while they both faced the rear passenger side window. Nickerson claimed that after about fifteen minutes he ejaculated onto her lower back, at which point he pulled up his pants and returned to the front seat. He retrieved the woman's purse from the floor in front of the passenger seat and handed it to her. He testified that the woman removed "a white cottonish thing" from her bag, and wiped her back before she dressed and exited the car. According to Nickerson, he did not penetrate the woman anally or digitally, nor did he hit, bite, choke, or otherwise harm her.

Although Nickerson acknowledged that he had a sexual encounter with Emma on a day earlier in the week that she was assaulted, he insisted that it could not have been on June 30, the night that she was brutally attacked. Nickerson—who had been adopted as a child after spending years in foster care—testified that he spent that entire day preparing to attend a long-awaited family reunion on Sunday, July 1, 2007, where he was to meet many of his relatives for the first

---

[9] Although defendant admitted to using the services of a prostitute "about three times" in the past, on cross-examination he could not recount in any detail where these transactions occurred, how much he had paid, or what services he received—in stark contrast to the detailed account of his encounter with Emma.

[10] When asked on cross-examination about the discrepancy in his testimony regarding the quoted price of services, what he paid, and what services he received, defendant explained that it was all according to a "code" that prostitutes frequently use.

time. According to Nickerson, he spent all of June 30 shopping and preparing for the family barbecue. He claimed that he picked up his mother-in-law, Yula Walker (Walker), who spent the night at Nickerson's home. He further testified that at around 10 p.m., his cousin Derek Richardson (Richardson) arrived and the two played video games until around 2 a.m., at which point Nickerson went to bed.

One month before trial, defense counsel disclosed that Nickerson intended to rely on an alibi defense. Defense counsel indicated that Walker and Richardson could be called to corroborate Nickerson's claim that he spent the entire evening of June 30 into July 1 at home with his relatives—a location that was approximately half a mile from the house that Emma visited that evening. Significantly, although both Walker and Richardson had given this account to the state's investigators prior to trial, after the trial commenced and after she spoke to Richardson, Walker changed her version of the events and claimed that she was mistaken about the address at which the family gathered. Walker recalled that the family actually had spent that evening with Nickerson at a different address in Pawtucket, approximately one mile from defendant's home. Faced with this development, the prosecutor argued that the notice of alibi was fatally flawed; defense counsel, however, assured the court that no alibi witness would be called to testify in a manner inconsistent with the information provided in the original alibi notice, which referenced defendant's home as the place where the family spent the evening. Consequently, although Nickerson testified that he was home that evening, and the trial justice did not preclude the defense from calling any witness, neither Walker nor Richardson testified about defendant's purported alibi. Instead, Nickerson testified in his own defense and maintained that, although he had sex with Emma earlier in the week, it was consensual and that the injuries she suffered on June 30 were consistent with having been in a fight, and not the

victim of a sexual attack.

On April 11, 2012, the jury found Nickerson guilty on five counts in the indictment, and he was acquitted on count 6—second-degree robbery—and count 7—assault with a dangerous weapon, to wit, a knife. On June 4, 2012, the trial justice heard and denied defendant's motion for a new trial. The trial justice sentenced Nickerson to concurrent terms of sixty years at the ACI, with fifty years to serve and ten years suspended with probation. Concerning count 5, the trial justice sentenced defendant to twenty years to serve concurrently with the sentence imposed on the first four counts.[11] The defendant timely appealed to this Court.

**Analysis**

**Alleged Rule 16 and Brady Violations**

On appeal, defendant argues that the trial justice erred in denying his motion to exclude the testimony of Sharon Mallard, the analyst from the Department of Health, based on an alleged violation of defendant's constitutional rights and his right to discovery in accordance with Rule 16 of the Superior Court Rules of Criminal Procedure. The defendant bases this argument on the fact that Mallard's handwritten bench notes, taken during her examination of Emma's forensic evidence kit, were not disclosed to defense counsel until trial had commenced. The defendant claims that this evidence was material and favorable, and was withheld in violation of Nickerson's constitutional right to due process and the state's discovery obligation under Rule 16. The state denies that a due process violation occurred because, the state contends, the content of Mallard's notes was neither exculpatory nor material. The state also argues that defendant's reliance on Rule 16 is misplaced, because Nickerson failed to show bad faith on the part of the prosecutor or show that he was prejudiced by the late disclosure of information

---

[11] Nickerson was also ordered to have no contact with Emma, register as a sex offender, undergo sex offender and anger management counseling, and to participate in substance abuse treatment.

- 11 -

contained in Mallard's bench notes.

Under Rhode Island law, a criminal defendant may obtain pretrial discovery pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure.[12] This Court previously has explained that the "overarching purpose" of Rule 16 is "to ensure that criminal trials are fundamentally fair." State v. McManus, 941 A.2d 222, 229 (R.I. 2008) (quoting State v. Briggs, 886 A.2d 735, 754 (R.I. 2005)). In fact, "[t]he primary purposes of the rule are to eliminate surprise at trial and 'to ensure that both parties receive the fullest possible presentation of the facts prior to trial.'" State v. Garcia, 643 A.2d 180, 186 (R.I. 1994) (quoting State v. Concannon, 457 A.2d 1350, 1353 (R.I. 1983)).

In determining whether a Rule 16 violation has occurred, a trial justice should consider "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." State v. Stravato, 935 A.2d 948, 951 (R.I. 2007) (quoting State v. Coelho, 454 A.2d 241, 245 (R.I. 1982)). If, however, the state deliberately failed to disclose evidence, "the defendant is entitled to a new trial, and no inquiry is needed into the presence of the other three factors." McManus, 941 A.2d at 229 (quoting Stravato, 935 A.2d at 951). Otherwise, it is within the sound discretion of the trial justice to "determine whether any harm has resulted from noncompliance with

---

[12] In pertinent part, Rule 16(a) of the Superior Court Rules of Criminal Procedure provides:

> "Discovery by Defendant. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:
> "* * *
> "(5) all results or reports in writing, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with a particular case * * * ."

discovery motions, and whether the harm can be mitigated." Briggs, 886 A.2d at 757 (quoting Coelho, 454 A.2d at 244-45).

In addition to Rule 16, "the due process clause of the United States Constitution requires that the state provide a criminal defendant with certain information." McManus, 941 A.2d at 229 (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). "In accordance with Brady, if a prosecutor has suppressed evidence that would be favorable to the accused and the evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted." DeCiantis v. State, 24 A.3d 557, 570 (R.I. 2011) (quoting McManus, 941 A.2d at 229-30). The Brady doctrine, however, "has its limits and does not 'extend an open invitation to criminal defendants to comb prosecution files for any or all information that might be remotely useful.'" Cronan ex rel. State v. Cronan, 774 A.2d 866, 880 (R.I. 2001) (quoting State v. Wyche, 518 A.2d 907, 908 (R.I. 1986)). Any nondisclosed information subject to Brady must "be material in the sense that its 'high value to the defense could not have escaped * * * [the prosecution's] attention.'" Id. (quoting Wyche, 518 A.2d at 910). A defendant, therefore, has the burden of showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Burnham, 58 A.3d 889, 900 (R.I. 2013) (quoting McManus, 941 A.2d at 230). Notably, however, the prosecution cannot be held responsible "for delivering information that is not within its custody or control." Id. (citing Wyche, 518 A.2d at 909).

"When reviewing a trial justice's decision with respect to whether a violation of Rule 16 or Brady occurred, this Court affords great deference to the trial justice and will not disturb that ruling unless he or she has committed clear error." McManus, 941 A.2d at 229 (citing Briggs, 886 A.2d at 755). This is because "[w]e long have recognized that 'the trial justice is in the best

position to determine whether any harm resulted from noncompliance with discovery motions * * * .'" Id. (quoting State v. Brisson, 619 A.2d 1099, 1102 (R.I. 1993)).

In the case at bar, the record reflects that, prior to trial, the prosecution complied with defendant's initial discovery request by providing Mallard's report of her analytical findings concerning the testing performed on the forensic evidence kit, and by informing the defense that Mallard would testify as to her conclusions regarding the report in order to establish that the evidence kit traveled along an unbroken chain of custody. Mallard's report, detailing her conclusions, was entered into evidence as exhibit No. 22. Before Mallard was called to testify on the afternoon of April 3, 2012, however, she provided the prosecutor with three pages of handwritten bench notes that were created while performing testing on the evidence kit. The prosecutor immediately gave the notes to defense counsel, who then moved to preclude Mallard from testifying as to her findings because of the late disclosure of the notes. Alternatively, defense counsel requested an overnight continuance to review the content of the notes, which consisted of shorthand markings and sketches, for "potentially exculpatory information contained therein." The trial justice reserved ruling on the motion to exclude the evidence, but she granted the requested recess to allow counsel to review the notes.

When trial commenced the following morning, the defense renewed its motion to preclude Mallard from testifying as to her findings. Counsel acknowledged that she had reviewed the notes with Mallard the previous afternoon, but contended that, based on the late disclosure, defendant was deprived of an opportunity to thoroughly explore what could potentially be exculpatory evidence with an expert in forensic pathology. Defense counsel maintained that, upon reviewing Mallard's notes, she determined that the samples played a role in the defense's case and that she felt the need to hire an expert. Defense counsel argued that,

- 14 -

based on defendant's account that he had sex with Emma the week before she was attacked, the relatively small quantity of sperm found by Mallard on the slides and smears was probative as to when the sperm was deposited, and thus the late disclosure and alleged inability to consult an expert witness deprived defendant of a meaningful opportunity to cross-examine Mallard concerning the test results.

The prosecution responded that the state had been unaware of Mallard's bench notes, and had turned them over to the defense immediately upon receiving them. Moreover, the state argued that defense counsel had notice that Mallard would be called to testify, and was provided with the document containing the summary of her analytical findings, marked as exhibit No. 22, which noted that a "[m]icroscopic examination revealed the presence of spermatozoa and/or partially intact spermatozoa on the vaginal and rectal samples," as well as on Emma's underwear—from which the DNA sample was developed. The prosecutor acknowledged defendant's right to cross-examine Mallard concerning the age and quantity of the sperm discovered on the tested samples, and noted that Mallard was being called for chain of custody purposes—to "show the integrity of the DNA that went all the way to ReliaGene"—where the DNA testing actually occurred. The state contended that the defense's argument was without merit, because the defense was well aware that "this case comes down to DNA," but at no time had defendant sought to hire his own experts to either retest the evidence or analyze the conclusions of any witness. As a result, the prosecution argued that Nickerson was not prejudiced by the late disclosure of Mallard's notes.

After hearing the parties' arguments, the trial justice determined that there was no evidence that Mallard's notes—marked exhibit No. 30 for identification—were purposely withheld from the defense. The trial justice further noted that, although the defense was

provided with the summary of Mallard's findings as to the presence of spermatozoa on the samples, the defense failed to seek production of notes or documents relating to the report or to pursue any independent investigation of the DNA evidence. The trial justice indicated that she had granted a continuance to permit counsel to review the notes with the witness. The trial justice also stated that the defense could have hired an expert to analyze Mallard's findings and had failed to do so. The trial justice declared that she "d[id] not believe that the mere failure to produce the underlying notes to their report preclude[d] the defense from retaining an expert in order to properly meet even the findings of Ms. Mallard contained within that report." As such, the trial justice determined that defense counsel's position was "really a strategic argument," and that defendant was not prejudiced by the late production of the bench notes, because defense counsel "could have inquired into these matters further with a consulting expert if it so desired."

Reviewing this ruling through our deferential lens, we are satisfied that the trial justice conducted the appropriate analysis in accordance with Rule 16, by first determining that the state's failure to produce Mallard's notes was inadvertent, and then concluding that Nickerson suffered no prejudice by the "mere failure to produce the underlying notes," because defendant was in possession of Mallard's conclusions as set forth in her report—which, we note, did not deviate from her bench notes—and had ample opportunity to further investigate those findings. In fact, defendant was aware that this case hinged on the outcome of forensic testing, because Emma was never able to identify her assailant. We also note that defendant only sought to exclude Mallard's testimony and did not move for a mistrial. Accordingly, we are unpersuaded by defendant's argument that he was prejudiced by the late disclosure of Mallard's bench notes, and we are satisfied that the trial justice did not err in finding that Rule 16 had not been violated in the context of this case.

Moreover, we are equally satisfied that the trial justice correctly found that a Brady violation did not occur in this case. When addressing this facet of defendant's argument,[13] the trial justice observed that the defense did not ask to pass the case based on the alleged late disclosure. The trial justice declared that she was convinced that defendant had notice of Mallard's conclusions—and what would be testified to—in advance of trial. The trial justice determined that, not only was the defense able to address Mallard's conclusions at trial, but "in fact, exploited that evidence during the course of trial as well," by eliciting from Mallard that it was impossible to determine the age of the sperm or when it was deposited on Emma's underwear, and that, despite the samples tested by Mallard, the only evidence that incriminated Nickerson was discovered by DNA testing conducted on the underwear cutting by another witness. For these reasons, the trial justice determined that further investigation of Mallard's bench notes would not have changed the result of the proceeding. Accordingly, because we are satisfied that the trial justice conducted the appropriate analysis, we decline to disturb this finding on appeal. See Burnham, 58 A.3d at 900 (the defendant has the burden of showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different") (quoting McManus, 941 A.2d at 230).

---

[13] When defendant's argument regarding the alleged Brady violation was initially raised—prior to Mallard testifying as to her conclusions—the trial justice did not address it as such, and instead focused her ruling on defendant's argument that Rule 16 had been violated. However, we are satisfied that the trial justice appropriately addressed this argument—and that it was preserved for review—when it was raised again by defendant during his motion for a new trial.

**Motion for Judgment of Acquittal**

**and**

**Motion for a New Trial**

On appeal, defendant argues that the trial justice erred in denying his motion for judgment of acquittal and motion for a new trial, claiming that (1) the prosecution failed to prove, beyond a reasonable doubt, that defendant was the perpetrator of the assaults against Emma, and that (2) the chain of custody of the evidence kit was not sufficiently established by the state and therefore, the evidence should have been excluded. The defendant also argues that the trial justice incorrectly denied his motion for a new trial based on the aforementioned alleged violations of Rule 16 and defendant's constitutional rights resulting from the disclosure of Mallard's technical notes at trial.

It is well settled that "[i]n reviewing a challenge to a trial justice's rulings on a motion for judgment of acquittal and a motion for a new trial, this Court 'first conducts a review of the new-trial motion.'" State v. Buchanan, 81 A.3d 1119, 1127 (R.I. 2014) (quoting State v. Gaffney, 63 A.3d 888, 893 (R.I. 2013)). This is "because both motions simultaneously raise a 'challenge to the [legal] sufficiency of the evidence,' and thus, 'we begin our review by conduct[ing] the more exacting analysis required for review of a ruling on a motion for a new trial.'" Id. (quoting Gaffney, 63 A.3d at 893).

When passing on a motion for a new trial, "the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" State v. Baptista, 79 A.3d 24, 29 (R.I. 2013) (quoting State v. Staffier, 21 A.3d 287, 290 (R.I. 2011)). In making this determination, "the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" Id.

(quoting Staffier, 21 A.3d at 290). This undertaking requires the trial justice to "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting State v. Paola, 59 A.3d 99, 104 (R.I. 2013)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Buchanan, 81 A.3d at 1127 (quoting State v. Otero, 788 A.2d 469, 472 (R.I. 2002)). Furthermore, "[i]f the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Id. (quoting State v. Horton, 871 A.2d 959, 967 (R.I. 2005)). We employ such a "deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" Baptista, 79 A.3d at 29-30 (quoting Paola, 59 A.3d at 104).

In the case at bar, the trial justice declared that defendant's motion for a new trial "asks this [c]ourt principally to determine whether the weight and credibility of the evidence at trial was sufficient to support the jury's verdict in this case." The trial justice proceeded to thoroughly detail all of the evidence and testimony presented at trial, noting that Emma's testimony "was very credible." The trial justice recounted that although the defense had the opportunity to vigorously cross-examine her, Emma gave her account of the assault "in measured tones," and "completely dispelled" any notion that the attack was fabricated. In fact, the trial justice found that after the assault, Emma's description of what transpired never wavered, and that the state "effectively corroborated" Emma's account with the testimony of others who saw

- 19 -

her in the immediate aftermath of the assault.

The trial justice specifically recounted the "credible" testimony of Dr. Goldberg, noting that the doctor's conclusions supported the physical and sexual assaults testified to by Emma, and discounted defendant's assertion that Emma's injuries were more consistent with having had been in a fight than the victim of a sexual assault. The trial justice detailed that the forensic testing conducted on the samples taken by Dr. Goldberg corroborated Emma's story, and specified that she saw no issues with the forensic evidence in the case, declaring "that there was no break in the chain of custody and no evidence of contamination such that the results of that testing and the match reference w[ere] accurate and reliable evidence for the jury to depend upon."

The trial justice also found that the photographs and evidence presented at trial corroborated Emma's account of the attack. The trial justice specifically discounted the defense's criticism of Emma's clothing having been lost; she noted that the defense had the opportunity to photograph the clothing before it went missing, and that, because there was no forensic testing conducted on the clothing, there was no loss of evidence "of any evidentiary significance." The trial justice concluded that, "[c]onsidering the credible trial testimony of [Emma] and the corroborative physical evidence and other testimonial evidence," she was satisfied that the jury reached the correct verdict.

The trial justice also stated that she was "satisfied that the [s]tate proved the identity of the perpetrator beyond a reasonable doubt." The trial justice detailed that, although Emma had given an accurate description of her assailant to Det. Muriel, defendant's true identity could not be established before 2011—when his DNA was entered into CODIS—because she did not know him and had never seen him before the attack. The trial justice commented that, in her

opinion, there were no photos of anyone resembling Nickerson in the first two photo arrays shown to Emma, and further, although Nickerson matched Emma's initial description of her attacker, Emma could not be faulted for failing to identify him in the final photo array that contained his photograph.[14] The trial justice concluded that the forensic evidence presented at trial "squared" with Emma's account of the assault, and, with her testimony and the other evidence presented, "establish the defendant as the perpetrator of the sexual and physical assaults beyond a reasonable doubt."

The trial justice also commented on defendant's defense of consent and alibi, describing it as "perfect." However, she noted that the jury rejected this defense "wholeheartedly," and with "good reason to do so." The trial justice explained that "defendant's story [was] engineered [and] self-serving[,] was not corroborated[,] and lacked credibility." She further detailed that Nickerson's testimony "was too carefully contrived to explain away the physical evidence and take advantage of other evidence," and noted that, on cross-examination, defendant "had difficulty sticking to his story." After a thorough recitation of Nickerson's testimony, the trial justice concluded that "the jury was within its rights and indeed correct to reject the defendant's testimony." The trial justice denied defendant's motion for a new trial based on insufficient evidence, and also denied—citing the analysis of her previous rulings—defendant's motion for a new trial based on alleged errors occurring at trial.

After careful review of the record before us, this Court is satisfied that the trial justice correctly addressed defendant's motion for a new trial and, based on her reasoning and thorough review of the evidence in this case, we refuse to disturb the trial justice's decision. The trial justice independently assessed the credibility of each witness and commented upon the weight of

---

[14] The trial justice, after closely examining the photo, explained that "it was not readily apparent to the [c]ourt which picture was his even with the defendant in court sitting feet away."

the evidence before agreeing with the jury verdict. We also discern no error with respect to the trial justice's conclusion that the state effectively established an unbroken chain of custody of the evidence that was tested for, and found to contain, defendant's DNA. Moreover, we are satisfied with the trial justice's analysis regarding defendant's claim of Rule 16 and <u>Brady</u> violations, and are of the opinion that she correctly denied defendant's motion for a new trial on these grounds. Accordingly, based on our review of the record before us, we conclude that the trial justice did not err when she rejected defendant's motion for a new trial.

Turning now to defendant's motion for judgment of acquittal, "it is well settled that when passing on 'a trial justice's denial of a motion for judgment of acquittal, this Court applies the same standard as the trial justice.'" <u>Buchanan</u>, 81 A.3d at 1128 (quoting <u>State v. Long</u>, 61 A.3d 439, 445 (R.I. 2013)). Thus, "[a] motion for a judgment of acquittal should be granted only if the evidence, viewed in the light most favorable to the prosecution, is insufficient to establish the defendant's guilt beyond a reasonable doubt." <u>Id.</u> at 1128-29 (quoting <u>Long</u>, 61 A.3d at 445). "If, however, a reasonable juror could find the defendant guilty beyond a reasonable doubt, the motion should be denied." <u>Id.</u> at 1129 (quoting <u>Long</u>, 61 A.3d at 445).

In this case, the trial justice denied the defendant's motion for judgment of acquittal at the close of the state's case after a detailed recitation of the evidence and witness testimony that had been presented up to that point. The trial justice unequivocally determined that, in addition to other testimony and evidence presented, Emma's testimony alone was sufficient to support all counts of the indictment beyond a reasonable doubt. Addressing the defendant's argument that the chain of custody was flawed, the trial justice recounted the travel of the evidence tested, concluding that it had been properly collected and transported, and specified that there was no indication of a break in the chain of custody of the underwear "sufficient to undermine its

reliability."[15] When the defendant renewed his motion for judgment of acquittal at the close of evidence, the trial justice—citing to the same reasoning—denied this motion as well. Because we conclude that the trial justice's decision is without error, any further analysis of the trial justice's denial of the defendant's motion for judgment of acquittal is unnecessary in light of our analysis and opinion regarding the defendant's motion for a new trial. See Buchanan, 81 A.3d at 1127 (noting that, when faced with a challenge to rulings on both a motion for a new trial and for judgment of acquittal, this Court first conducts "the more exacting analysis required for review of a ruling on a motion for a new trial") (quoting Gaffney, 63 A.3d at 893). Accordingly, we see no reason to disturb the trial justice's decision regarding the defendant's motion for judgment of acquittal.

### Conclusion

For the reasons set forth in this opinion, we deny and dismiss the defendant's appeal and affirm the Superior Court's judgment of conviction. The papers in this case may be returned to the Superior Court.

---

[15] Although defendant asserts that the trial justice erred in disregarding a purported missing link in the chain of custody of the underwear—namely, why it took so long for the samples to be tested and who transported the evidence kit from the hospital to the Department of Health—we are satisfied that the trial justice addressed this contention during her rulings on defendant's motion for judgment of acquittal and motion for a new trial, determining that there was no indication that the evidence had been tampered with or contaminated. To the extent that defendant posits this as a separate argument on appeal, we are equally satisfied that the trial justice did not err in finding that the state had established that the evidence had not been disturbed. See State v. Nelson, 982 A.2d 602, 612 (R.I. 2009) (noting that a showing of a continuous chain of custody is not necessary and that the state need not eliminate all possibility of tampering, but rather that evidence may be admitted upon a showing that "in all reasonable probability the evidence has not been subjected to tampering") (citing State v. Bracero, 434 A.2d 286, 290 (R.I. 1981)).



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       State v. Jason Nickerson.

**CASE NO:**       No. 2012-342-C.A.
                  (P1/11-1596A)

**COURT:**       Supreme Court

**DATE OPINION FILED:**  July 10, 2014

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                  Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

                  For State:  Jane M. McSoley
                           Department of Attorney General

                  For Defendant:  Lara E. Montecalvo
                           Office of the Public Defender