# United States Court of Appeals
## For the First Circuit

No. 06-2709

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE A. PARET-RUIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and DiClerico,** District Judge.

Víctor González-Bothwell, Assistant Federal Public Defender,
with whom Joseph C. Laws, Jr., Federal Public Defender, was on
brief for appellant.
Mariana E. Bauzá, Assistant United States Attorney, with whom
Rosa E. Rodríguez-Vélez, United States Attorney, and Nelson Pérez-
Sosa, Assistant United States Attorney, were on brief for appellee.

May 19, 2009

*Of the District of New Hampshire, sitting by designation.

**DICLERICO, District Judge**.    Following a five-day trial, appellant Jorge Alberto Paret-Ruiz ("Paret-Ruiz") was found guilty of conspiracy to import with intent to distribute, and to possess with intent to distribute, five or more kilograms of cocaine.  He argues that the evidence was insufficient to sustain his convictions, that the district court erred in denying his request for a new trial based on his proffer of newly discovered evidence and his claim that the government suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that the government made an improper argument at trial by suggesting that the jury could find him guilty based solely on an agreement with a government agent.  Because we conclude that the evidence admitted at trial was insufficient to support Paret-Ruiz's conviction, we reverse the verdict and remand with instructions to enter a verdict of not guilty.  The other issues Paret-Ruiz raises need not be addressed.

I.

A.  Background Facts

The government presented its case through the testimony of Agent Jesus González ("Agent González"), a special agent with the Drug Enforcement Administration ("DEA").  The government also played for the jury numerous audio recordings of conversations between Agent González and Paret-Ruiz, and introduced Spanish and English transcripts ("audio transcripts") of the audio recordings

-2-

into evidence. Because Paret-Ruiz asks us to review the sufficiency of the evidence, it is his burden on appeal to provide the relevant portions of the record. See Fed. R. App. P. 10(a); Local Rule 11(a); Muniz Ramirez v. Puerto Rico Fire Services, 757 F.2d 1357, 1358 (1st Cir. 1985) ("[I]t is the appellant's responsibility to ensure that the record is complete, i.e., that it contains all papers necessary for the determination of the issues presented by the appeal."). In his brief, Paret-Ruiz relies upon Agent González's testimony as well as a portion of those audio transcripts which he claims are relevant. The record contains the trial transcripts, which include Agent González's testimony, and the portions of the audio transcripts on which Paret-Ruiz relies. The government, in its brief, relies entirely on Agent González's testimony, which includes references to the audio recordings. We review Paret-Ruiz's arguments on appeal based upon the record as presented to us by the parties. Cf. United States v. Morales-Madera, 352 F.3d 1, 11-12 (1st Cir. 2003) (finding record sufficient for appellate review despite absence of one wiretap tape which government did not rely upon to prove its case and which government witness summarized in his testimony).

We recite the facts in the light most favorable to the verdict. United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008). In 2003, the Federal Bureau of Investigation ("FBI") informed the DEA that one of its confidential informants ("FBI CI") was approached by Paret-Ruiz, who was looking to acquire a boat for

the purpose of transporting cocaine from other Caribbean islands into Puerto Rico. The DEA began its investigation of Paret-Ruiz's activities in January of 2004. On January 28, 2004, the FBI CI met with Paret-Ruiz to discuss his request for a boat. Agent González supervised the photographic surveillance of this meeting.

On February 3, 2004, Agent González posed as a drug trafficker and met with the FBI CI and Paret-Ruiz aboard a boat owned by the DEA that is used to conduct undercover drug transactions. Agent González gave Paret-Ruiz a tour of the boat, showing him the hidden compartments, which were of particular interest to Paret-Ruiz. Paret-Ruiz initially indicated that he wanted to purchase the boat, but Agent González informed him that this was not possible. Paret-Ruiz then stated that several different acquaintances had cocaine contacts in Antigua and St. Maarten, and that he was interested in using the boat, and Agent González's services, to smuggle cocaine into Puerto Rico and deliver it to these acquaintances. Agent González and Paret-Ruiz also discussed the price of the cocaine and the costs of transporting it. Through subsequent investigation, Agent González discovered that Adalberto Coriano-Aponte ("Coriano") had cocaine contacts in St. Maarten, and that Coriano and Efraín Santana-Ortiz ("Santana"), an acquaintance of Coriano's, were two of the intended recipients for the cocaine.[1]

_____

[1]At trial, Paret-Ruiz testified that he never actually negotiated drug deals with anyone, that he lied to Agent González about the deals, and that he did not know Coriano.

In a phone conversation on February 8, 2004, Paret-Ruiz told Agent González that he had finished a meeting with some individuals and asked if Agent González would show them the boat if necessary. Paret-Ruiz did not identify these individuals, and Agent González never confirmed their identities. Agent González declined to show the undercover boat. In another phone conversation on February 9, 2004, Paret-Ruiz told Agent González that some individuals had two cocaine loads available, for 300 and 500 kilograms each, but that he had not discussed fees with them. Following this conversation, Agent González, the FBI CI, Paret-Ruiz, and another undercover DEA agent met at a restaurant. At this meeting, Paret-Ruiz explained that he met with other unidentified individuals the previous day and they offered him two loads of cocaine, consisting of 200 and 500 kilograms, to be picked up in Antigua, using Agent González's undercover boat, which would be escorted by police or military officials up to 30 miles out to sea.

On February 10, 2004, Paret-Ruiz told Agent González that he was going to meet with unidentified individuals to discuss their February 9 meeting. At a February 13, 2004, meeting, Paret-Ruiz again told Agent González of the other cocaine loads, consisting of 300 and 500 kilograms, that were still available in Antigua. Agent González stated that he would like a fee of twelve to fifteen percent, depending upon the size of the cocaine load. Paret-Ruiz told Agent González that he would negotiate for twenty percent, so

that he could make some money.  They also discussed the possibility that the owner of the drugs might accompany Agent González on his boat from Antigua to Puerto Rico and instructions for loading the cocaine from the boat into a vehicle for delivery in Puerto Rico.

During a meeting on February 24, 2004, Paret-Ruiz told Agent González that he was going to meet with some unidentified individuals in a few days to continue negotiations regarding the cocaine loads from Antigua.  At a February 25 meeting, Paret-Ruiz told Agent González that one of the cocaine loads he had been working on was no longer available because it had been picked up by someone else, but that other loads were still available.  Agent González testified that he was unsure which loads Paret-Ruiz was referring to in this conversation.  Paret-Ruiz then accepted $2,000 from Agent González to travel to Antigua to confirm that there was cocaine available for transport to Puerto Rico.  However, Paret-Ruiz never went to Antigua and did not repay the money.  Later that same day, Paret-Ruiz met with some unidentified individuals to continue discussions.

On March 2, 2004, Paret-Ruiz told Agent González that he met with two individuals about transporting cocaine using Agent González's boat, but they were not interested because they wanted to buy, not rent, a boat to transport the drugs.  Paret-Ruiz also said that he was currently in discussions with another unnamed individual.  Agent González later discovered that the individual was Santana.  Agent González and Paret-Ruiz met again on March 16,

2004. During the meeting, Paret-Ruiz made a phone call to someone, later identified as Santana, and asked him to tell an unnamed individual, later identified as Coriano, that he was meeting with the owners of the boat, and to ask whether Coriano was still interested in the drug transaction. Paret-Ruiz concluded the call, and Santana called back some time later. After finishing his conversation with Santana, Paret-Ruiz informed Agent González that Santana and Coriano were still interested in obtaining transportation for cocaine loads but that they could not agree on the fee he and Agent González would take for transporting the cocaine. Paret-Ruiz demanded a fee of twenty percent and Santana would only offer sixteen percent, which Paret-Ruiz would not accept. Paret-Ruiz stated, however, that he would meet with Santana later that day. When Agent González asked to be included in this meeting, Paret-Ruiz declined because he was afraid of being excluded from a transaction.

On March 17, 2004, Paret-Ruiz told Agent González in a phone conversation that Santana and Coriano were still interested in working with them. On March 18, Paret-Ruiz and Agent González met to discuss Paret-Ruiz's meeting with Santana on March 16. Paret-Ruiz told Agent González that other unidentified individuals were arrested and that his negotiations with them regarding drug loads had therefore terminated. Paret-Ruiz stated his concern about the arrests and suggested that they should delay their drug

transaction for awhile but that they would resume negotiations later.  The drug transaction never occurred.

In August of 2004, Agent González, as an undercover agent, met with Coriano, the FBI CI, and another individual to discuss the shipment of cocaine from St. Maarten into Puerto Rico. Coriano had approached the FBI CI looking for transportation for cocaine.  In October of 2004, Santana spoke with the FBI CI and told him that his discussions with Paret-Ruiz fell through because they could not agree on the fee.  In speaking with Santana, Paret-Ruiz had apparently blamed the FBI CI for requiring a higher fee; the FBI CI corrected Santana and told him that Paret-Ruiz was the one demanding the higher fee.

## B.  Procedural History

On August 9, 2005, an indictment was returned against Paret-Ruiz, Santana, and Coriano for conspiracy to import with intent to distribute, and to possess with intent to distribute, five or more kilograms of cocaine, from approximately November 1, 2003, through approximately March 18, 2004.[2]  See 21 U.S.C. §§ 841, 846, 960, and 963.  At his arraignment, Paret-Ruiz pled not guilty to the charges against him.

Paret-Ruiz's trial began on June 19, 2006.  At the close of evidence, Paret-Ruiz moved for acquittal under Federal Rule of Criminal Procedure 29, based on his claim that the evidence did not

---

[2]Neither Santana nor Coriano went to trial.

establish that there was an agreement to import or possess cocaine with anyone other than Agent González and the FBI CI.[3]  The court denied the motion.  Paret-Ruiz then testified and rested on June 28.  After the jury charge was given, Paret-Ruiz renewed his Rule 29 motion, which the court again denied.  The jury found Paret-Ruiz guilty on both counts of conspiracy.

At sentencing, Paret-Ruiz requested a sentence below the applicable guideline range.  The court responded, "The government may be very much inclined to accept such an argument if, for example, you waive your right to appeal."  At the court's urging, defense counsel spoke to Paret-Ruiz about a waiver, but Paret-Ruiz declined.  Paret-Ruiz was sentenced to 180 months in prison, which was below the applicable guideline range.

II.

A.  Sufficiency of the Evidence

Paret-Ruiz argues that the evidence was insufficient to support his drug conspiracy convictions because there was no evidence produced at trial that he reached an agreement to import or possess cocaine with anyone other than a government agent.  We review Paret-Ruiz's sufficiency of the evidence claim de novo, considering the evidence in the light most favorable to the

---

[3]Rule 29 provides that: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

verdict.  United States v. Gomez-Rosario, 418 F.3d 90, 105 (1st Cir. 2005).  We will not overturn a guilty verdict "unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered [it]."  United States v. Nelson-Rodriguez, 319 F.3d 12, 27 (1st Cir. 2003).  Further, we will not assess the credibility of witnesses, as that is a role reserved for the jury.  United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003).

To establish that the defendant is guilty of participating in a narcotics conspiracy, the government must prove, beyond a reasonable doubt, that "'an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed.'"  Gomez-Rosario, 418 F.3d at 105 (quoting United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005)).  "The essence of the crime is the conspirators' agreement to act in concert" to import, possess, and distribute illegal drugs.  United States v. Cruz, 568 F.2d 781, 782 (1st Cir. 1978); see United States v. Rodriguez, 525 F.3d 85, 104 (1st Cir. 2008).  The agreement must exist between two or more persons, and as a matter of law, there can be no conspiracy between a defendant and a government agent. United States v. Castellini, 392 F.3d 35, 51 n. 11 (1st Cir. 2004); United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987).

An agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit.  Gomez-Rosario, 418

-10-

F.3d at 107; United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999); United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) ("[A]n agreement . . . may be inferred from a development and collocation of circumstances.") (internal quotation marks omitted). A conspiratorial agreement, therefore, "need not be express so long as its existence can plausibly be inferred from the defendants' words and actions . . . ." Concemi, 957 F.2d at 950. Further, the conspiracy need not succeed for the conviction to stand. Nelson-Rodriguez, 319 F.3d at 28.

The indictment in this case charged an agreement among Paret-Ruiz, Santana, Coriano, and other known and unknown individuals to import, possess, and distribute cocaine.[4] The evidence presented by the government to support the conspiracy charges consisted of the testimony of Agent González, audio recordings of conversations between Agent González and Paret-Ruiz, and an audio recording of a conversation between Paret-Ruiz and Santana which Agent González overheard.[5] Because a conspiracy cannot exist between a government agent and an individual, these conversations are not direct evidence of the charged conspiracy. The conversations may, however, constitute circumstantial evidence

---

[4]In its brief and at oral argument, however, the government only argued that Paret-Ruiz conspired with Santana and Coriano. The government, therefore, has waived any arguments that Paret-Ruiz conspired with additional unknown individuals. United States v. Molina, 407 F.3d 511, 524 (1st Cir. 2005) (recognizing that arguments not briefed by government are deemed waived).

[5]Agent González testified that he heard only Paret-Ruiz's portion of the conversation.

of a conspiracy among Paret-Ruiz, Santana, and Coriano if they show that these individuals agreed to work together to import and possess, with an intent to distribute, five or more kilograms of cocaine in violation of United States law. See Nelson-Rodriguez, 319 F.3d at 28; United States v. Elledge, 723 F.2d 864, 866 (11th Cir. 1984).

Agent González testified that Paret-Ruiz was involved in discussions with numerous unidentified individuals regarding cocaine loads in Antigua, and that several discussions fell through for a variety of reasons. He also testified that Paret-Ruiz had discussions with individuals he later identified as Santana and Coriano, who had cocaine contacts in St. Maarten and Antigua. At the March 16, 2004, meeting, Agent González overheard Paret-Ruiz's side of a phone conversation Paret-Ruiz had with an individual later identified as Santana, in which he told Santana that he was with the people who had the boat, and asked if Coriano was still interested. Santana called Paret-Ruiz back and he confirmed that Coriano was still interested. However, they could not agree on the fee which Paret-Ruiz and Agent González would collect because Paret-Ruiz insisted upon a twenty percent fee.

Following this meeting, Paret-Ruiz stated that Santana and Coriano were still interested, but that he wanted to wait because some individuals had recently been arrested on drug charges. Agent González had no further conversations with Paret-Ruiz. In August of 2004, Coriano met with Agent González and the

-12-

FBI CI regarding the transportation of cocaine loads into Puerto Rico. In October of 2004, the FBI CI met with Santana, who told the FBI CI that the discussions with Paret-Ruiz fell through because they could not agree on the fee.

This is a close case. While there is evidence of numerous discussions between Paret-Ruiz and several unidentified individuals regarding available cocaine loads as well as evidence of Paret-Ruiz's desire to effectuate a cocaine deal, there is a lack of sufficient evidence showing that he actually reached an "agreement to act in concert" with Santana and Coriano. Cruz, 568 F.2d at 782. Contrary to the government's assertion, the evidence often does not indicate which individuals Paret-Ruiz is referring to in his discussions with Agent González.[6] The government argues that there is evidence that Paret-Ruiz, Santana, and Coriano agreed on the specific amount of cocaine and the specifics regarding the pick-up and transportation of the cocaine by boat. Agent González's testimony regarding his conversations with Paret-Ruiz, however, establishes that an agreement existed only between Paret-Ruiz and Agent González. Although Agent González testified that Paret-Ruiz, Santana, and Coriano had generally "agreed," he did not testify as to what they agreed on, and in the same statement, Agent González recalls that "they [Santana and Coriano] were still

_____

[6]Through later investigations, Agent González was only able to identify Santana and Coriano as two of the individuals Paret-Ruiz initially referred to on February 3, 2004, and as individuals with whom he was in discussions with from March 2, 2004, through March 17, 2004.

-13-

seeking transportation for the drug shipments," which indicates that they had not reached an agreement with Paret-Ruiz.

The government also cites to Nelson-Rodriquez, and argues that a completed transaction is not necessary in proving the existence of a conspiracy. In Nelson-Rodriquez, three of the defendants appealed from their drug conspiracy convictions and argued that the evidence was insufficient to support the existence of a conspiracy because "many of the drug importation plans never came to fruition" and their "negotiations failed to produce a complete 'meeting of the minds' on issues such as the exact location for the handover of the drugs at sea or the division of the proceeds." 319 F.3d at 28. Noting that a conspiracy conviction does not require that the conspiracy succeed, nor that the underlying act even be attempted, we held that there was sufficient evidence for the jury to conclude that an agreement existed among the defendants to "work together to buy and sell illegal narcotics." Id. The evidence in Nelson-Rodriguez showed that the defendants had agreed to import several loads of cocaine from Columbia and heroin from St. Maarten. Their agreement was evidenced by their plans to procure a boat, navigational charts, and radios, and by the designation of boat captains, coordinators, security monitors, and drug distributors. An undercover agent also met with two coconspirators on several occasions, at which they agreed to work together to import 1,100 kilograms of cocaine from Colombia, although the transaction ultimately fell through for

-14-

numerous reasons. There was also evidence that a few of the coconspirators successfully imported 250 kilograms of cocaine into Puerto Rico.

In the present case, the evidence was sufficient for a reasonable jury to find that Paret-Ruiz wanted to make a deal to transport drugs into Puerto Rico. A reasonable jury could also find that Coriano had cocaine connections in St. Maarten and Antigua, that he and Santana were looking for someone to transport and deliver the cocaine to them in Puerto Rico, and that Paret-Ruiz and Santana had discussions regarding the transportation of cocaine. The evidence was insufficient, however, for a reasonable jury to conclude that Paret-Ruiz had an agreement with anyone other than Agent González to work together to import and possess illegal drugs. Unlike the evidence presented in Nelson-Rodríguez, which showed that the coconspirators had agreed to work together to import drugs, here there was only evidence of Paret-Ruiz's failed attempts to make a deal with Santana and Coriano.

The government further argues that by reaching a guilty verdict after hearing Paret-Ruiz's testimony, the jury necessarily rejected it as untruthful, which provides further evidence of his guilt. See United States v. Restrepo-Contreras, 942 F.2d 96, 99 (1st Cir. 1991). While we have applied this principle before when upholding convictions, it has been in cases where there was, independent of the defendant's testimony, sufficient evidence of guilt. See United States v. Hadfield, 918 F.2d 987, 999 (1st Cir.

-15-

1990) (finding evidence of guilt "was further bolstered by what the jury could have found to be a tall tale"). Here, Paret-Ruiz's testimony notwithstanding, there is insufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Paret-Ruiz reached an agreement with Santana and Coriano to import, possess, and distribute cocaine. Therefore, because we find that the evidence, "'viewed in the light most favorable to the verdict[,] gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,'" we must reverse the conviction. United States v. Reyes, 352 F.3d 511, 518 (1st Cir. 2003) (quoting United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998)).

Before concluding, we add a final note regarding the trial court's statements to Paret-Ruiz at sentencing. When Paret-Ruiz requested that the court consider a sentence below the guideline range, the court responded that the government may agree to such a departure "if, for example, you waive your right to appeal." Paret-Ruiz declined to waive his right to appeal. However, we caution the trial court against engaging in such discussions with the defendant.

III.

For the foregoing reasons, based on the record as presented to us, no rational jury could find Paret-Ruiz guilty beyond a reasonable doubt of conspiracy to import cocaine with

intent to distribute, or conspiracy to possess cocaine with intent to distribute.  We reverse the verdict and remand with instructions to enter a verdict of not guilty.