# United States Court of Appeals
## For the First Circuit

No. 14-2134

JORGE A. PARET-RUIZ,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]
[Hon. Silvia Carreño-Coll, U.S. Magistrate Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Edelmiro Salas González for appellant.
Steve Frank, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Benjamin Mizer, Principal Deputy Assistant Attorney General, Rosa E. Rodríguez-Vélez, United States Attorney, and Mark B. Stern, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellee.

June 28, 2016

**LIPEZ**, **Circuit Judge**. Appellant Jorge Paret-Ruiz ("Paret") was convicted and imprisoned for nearly four years on drug conspiracy charges that a previous panel of this court concluded were not supported by the evidence produced at his trial. See United States v. Paret-Ruiz, 567 F.3d 1 (1st Cir. 2009). The charges also led to Paret's forfeiture of two trucks and a boat. Following the reversal of his conviction, Paret filed this civil suit under the Federal Tort Claims Act ("FTCA"), alleging, inter alia, false arrest and imprisonment, malicious prosecution, and the unlawful deprivation of his property. The district court found no basis for relief on any of Paret's claims.[1] Having carefully reviewed the record and law, we agree that Paret has no available remedy. Hence, we affirm.

## I. Background

In recounting the background of this appeal, we describe the evidence as presented in Paret's criminal and civil proceedings without drawing inferences in favor of either party. Where facts are disputed, we identify them as such.

---

[1] The district court issued two opinions disposing of Paret's claims, the latter of which was written by the magistrate judge after a bench trial. See Paret-Ruiz v. United States, No. 11-1404 (SCC), 2014 WL 4729122 (D.P.R. Sept. 23, 2014); Paret-Ruiz v. United States, 847 F. Supp. 2d 289 (D.P.R. Mar. 6, 2012). For simplicity, we refer to "the district court" in describing the proceedings and both dispositions.

## A. The Criminal Proceedings

Paret's arrest followed an investigation in which a confidential informant for the Federal Bureau of Investigation ("FBI") and a special agent for the Drug Enforcement Administration ("DEA"), posing as drug traffickers, had numerous encounters with Paret by phone and in person. As described in our prior opinion, the government's case at trial consisted primarily of the testimony of the agent, Jesus González, supported by audio recordings and transcripts of conversations between Paret and González. See id. at 2-5. According to González, Paret became a DEA target in early 2004 after he told the FBI informant he was looking for a boat to transport drugs from other Caribbean islands to Puerto Rico. Id. at 3. On multiple occasions, Paret told González of his discussions with unidentified individuals who were to secure the drugs that González would be hired to transport. Id. at 3-4. At one point, González gave Paret $2000 that González told Paret to use, at least in part, to travel to Antigua to confirm the availability of drugs there. Id. at 4; Paret-Ruiz v. United States, No. 11-1404 (SCC), 2014 WL 4729122, at *1 (Sept. 23, 2014). Paret did not make such a trip.

González's encounters with Paret ended in March 2004, after Paret told the agent he had been unable to reach an agreement with his intended drug source on the transportation fee. 567 F.3d at 4. Paret suggested holding off on further negotiation because

other individuals with whom he had been in contact had been arrested. Id. Paret and González had no further conversation. Id. at 6-7. However, González testified that he was able to identify two men whom he believed were Paret's contacts -- Efraín Santana-Ortiz ("Santana") and Adalberto Coriano-Aponte ("Coriano") -- and he subsequently met with Coriano to discuss transporting cocaine. See id. at 4. In addition, González reported a conversation between the FBI informant and Santana, in which -- according to the informant -- Santana confirmed Paret's statement that negotiations for a drug transport had broken down over the fee. See id. at 4-5.

Paret, Santana and Coriano subsequently were charged, in two counts, with conspiracy to import and conspiracy to possess five or more kilograms of cocaine with intent to distribute. The indictment contained a third count for forfeiture of "any property constituting, or derived from, any proceeds that the defendant obtained directly or indirectly . . . as a result of such violation or that facilitated the commission of such violation, up to the amount of four million eighty five thousand dollars ($4,085,000.00)." Paret was arrested on August 12, 2005, and ordered detained pending trial, which took place in June 2006.

At trial, following presentation of the government's case, Paret testified in his own defense. He initially acknowledged that he had unsuccessfully attempted to secure a load of drugs for

- 4 -

González to transport to Puerto Rico,[2] but then said that he had actually fabricated the negotiations he reported to González and the informant "because I knew they were police" and "[t]hey had been after me for a long time, and I knew that and I made it up. It wasn't real." When asked on cross-examination why, given his awareness of their identity, he did not simply reject the drug-dealing proposition, Paret said he had been persecuted and abused by the police for more than thirty years because he had angered "powerful figures" in the community who "swore to take vengeance" on him. He asserted that, "for this reason, and many others which I can explain, . . . was the reason why I decided to take up this situation, to see if I could somehow put the brakes on this abuse that had been going on on my person." Paret acknowledged talking on the phone to Santana, but he said the call was about the purchase of a horse. He said he had never spoken with Coriano.

---

[2] Paret testified that, at a meeting on a boat, he spoke with González and the FBI informant "about bringing over some controlled substances to Puerto Rico by boat." The exchange continued as follows:

> Q. After that meeting, did you try to secure a load of drugs for [González] to bring into Puerto Rico?
> A. Yes, that's right, on that occasion.
> Q. Did you ever succeed in negotiating to import any loads of drugs from anywhere to Puerto Rico?
> A. No. No, sir.
> Q. But you tried?
> A. That's right.

The jury found Paret guilty on the two conspiracy counts, and the court ordered forfeiture in the amount of $20,000 on the third count.  Nearly three years later, in May 2009, this court set aside the convictions.  Noting that "[t]his is a close case," the panel held that "there is a lack of sufficient evidence showing that [Paret] actually reached an agreement to act in concert with Santana and Coriano."  567 F.3d at 7 (internal quotation marks omitted).  The panel observed that, despite "evidence of numerous discussions between [Paret] and several unidentified individuals regarding available cocaine loads as well as evidence of Paret-Ruiz's desire to effectuate a cocaine deal," González's testimony "establish[ed] that an agreement existed only between Paret-Ruiz and Agent González."  Id.    Paret was released from custody on June 15, 2009.

## B. The Administrative Forfeiture

In addition to including a forfeiture count in the indictment, the government initiated civil forfeiture of two trucks and a boat that it had seized from Paret.  See 21 U.S.C. § 881(a) (describing types of property subject to administrative forfeiture, including "vehicles, or vessels, which are used, or are intended for use, to transport" controlled substances (quoting § 881(a)(4)));[3] 18 U.S.C.

---

[3] Seizures made under § 881 require a warrant unless, inter alia, "there is probable cause to believe that the property is subject to forfeiture and . . . the seizure is made pursuant to a lawful arrest or search."  18 U.S.C. § 981(b)(2)(B), (b)(2)(B)(i);

§ 983 (specifying procedures for civil forfeiture proceedings). To provide context, we describe the legal framework governing civil forfeiture before recounting what occurred in this case.

### 1. Legal Background

The government may obtain <u>civil</u> forfeiture of property associated with criminal activity through proceedings that may be either judicial or nonjudicial in nature -- depending on whether, and how, the owner responds to the government's confiscation of his property.[4] After seizing property, the government must notify "interested parties" that they may file a claim to contest the seizure by a deadline specified in the notice letter. <u>See</u> 18 U.S.C. § 983(a)(1)(A)(i), (a)(2)(A), (a)(2)(B). If a claim is filed, <u>see</u> <u>id.</u> § 983(a)(2)(A), the government must initiate a judicial proceeding in which it will bear the burden of demonstrating, "by a preponderance of the evidence, that the

---

see <u>also</u> 21 U.S.C. § 881(b) (stating that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General in the manner set forth in section 981(b) of Title 18"). The particulars of the seizure are not at issue in this case.

[4] The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202 (codified in part at 18 U.S.C. § 983), "significantly modified the rules governing both judicial and nonjudicial forfeitures to ensure that property owners benefit from the guarantees of due process of law." Rebecca Hausner, Note, <u>Adequacy of Notice Under CAFRA: Resolving Constitutional Due Process Challenges to Administrative Forfeitures</u>, 36 Cardozo L. Rev. 1917, 1918 (2015); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967</u>, 731 F.3d 189, 195-96 (2d Cir. 2013).

property is subject to forfeiture," id. § 983(c)(1). If no claim is filed, the property is forfeited administratively. See 19 U.S.C. § 1609.

Once a civil declaration of forfeiture is issued, whether administratively or through a judicial proceeding, the forfeiture is generally challengeable only on the basis of inadequate notice. See Caraballo v. United States, 62 F. App'x 362, 363 (1st Cir. 2003) (per curiam); 18 U.S.C. § 983(e) (providing for a motion to set aside forfeiture based on lack of notice); id. § 983(e)(5) (stating that "[a] motion filed under this subsection shall be the exclusive remedy for seeking to set aside a declaration of forfeiture under a civil forfeiture statute"). Although a claimant may file a petition for remission or mitigation, see 19 U.S.C. § 1618 (providing for "Remission or mitigation of penalties"),[5] the decision whether to grant such relief is solely within the agency's discretion. See Malladi Drugs & Pharms., Ltd. v. Tandy, 552 F.3d 885, 887-88 (D.C. Cir. 2009) (citing 28 C.F.R. §§ 9.3, 9.7).

---

[5] The civil forfeiture regime as applied to drug-related seizures of property incorporates many of the procedures governing forfeiture under customs law, codified in Title 19, including the availability of remission or mitigation. See 21 U.S.C. § 881(d). Pursuant to 19 U.S.C. § 1618, property subject to forfeiture may be returned to its owner based on a finding, inter alia, that "such . . . forfeiture was incurred without . . . any intention on the part of the petitioner to . . . violate the law," or that mitigating circumstances exist to justify relief.

Two aspects of civil forfeiture are of particular note here. First, the government may pursue civil forfeiture simultaneously with a criminal prosecution that includes a forfeiture count. See 18 U.S.C. § 983(a)(3)(C); see also United States v. Ursery, 518 U.S. 267, 274 (1996) ("Since the earliest years of this Nation, Congress has authorized the Government to seek parallel in rem civil forfeiture actions and criminal prosecutions based upon the same underlying events."). Second, notwithstanding the alleged link to criminal activity that justified the property's seizure, civil forfeiture may occur without a finding of criminal liability. See Caraballo, 62 F. App'x at 363-64 ("To prosecute a civil forfeiture action, . . . the government need not prove that the owner committed a crime." (citing United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984))); see also United States v. Bonventre, 720 F.3d 126, 132 (2d Cir. 2013) ("A civil forfeiture action is an action in rem, and therefore is based solely on the origin of the property, not . . . upon the culpability of the owner. In contrast, criminal forfeiture actions are in personam sanctions and thus depend on the defendant's guilt." (omission in original) (internal quotation marks omitted) (citation omitted)).[6]

---

[6] In an article on CAFRA, the then-Assistant Chief of the Asset Forfeiture and Money Laundering Section of the Department of Justice observed that "[p]arallel civil and criminal forfeiture actions are routine." Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties, 27 J. Legis.

## 2. Paret's Administrative Forfeiture

Paret does not dispute that he received the statutorily required notice of the seizure of his trucks and boat.[7]  Indeed, he submitted a written claim for the vehicles that was twice rejected for failing to conform to statutory requirements: first, because it was not made under oath, see 18 U.S.C. § 983(a)(2)(C)(iii), and then because it was resubmitted late, see id. § 983(a)(2)(B).  In denying the claim the second time, the DEA noted that Paret had not filed a petition for remission or mitigation, but it allowed him twenty days from "receipt of this letter to file a petition for an administrative ruling by this office before the property is disposed of according to law."  It does not appear that such a petition was filed, and the vehicles were administratively forfeited in March 2006 -- several months before the drug conspiracy trial.

---

97, 147 (2001).  He elaborated as follows: "Indeed, maintaining a parallel civil forfeiture case, or preserving the option of filing such a case in the future, is absolutely necessary in light of the limited nature of criminal forfeiture," which is "available only if the defendant is convicted of the crime giving rise to the forfeiture."  Id.  The civil asset forfeiture scheme remains controversial, however, even after the reforms implemented by CAFRA.  See infra note 18.

[7] The notice sent to Paret stated that he could "petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court."

## C. The Civil Lawsuit

In September 2010, about a year after his release from prison, Paret filed an administrative claim with the DEA alleging damages of $585,000 stemming from his arrest, prosecution, and the forfeiture of his property. The DEA denied the claim, and Paret then filed this lawsuit under the FTCA asserting causes of action for false arrest and imprisonment, malicious prosecution, excessive force, and improper taking of his property. The district court dismissed the claims alleging physical harm and the unconstitutional taking of his property,[8] but allowed the remaining claims to go forward.

A bench trial was held on the claims for false arrest and imprisonment,[9] malicious prosecution, and tortious deprivation of property. The court ultimately concluded, however, that the deprivation of property and false imprisonment claims failed as a matter of law, the former because Paret's civil forfeiture

---

[8] The constitutional claim was dismissed as time-barred based on the court's conclusion that a one-year statute of limitations applied. The court also dismissed Paret's claims against the DEA on the ground that the United States is the only proper defendant in an FTCA action.

[9] The Supreme Court has noted that the torts of "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." Wallace v. Kato, 549 U.S. 384, 388 (2007). Like the Supreme Court, "[w]e shall thus refer to the two torts together as false imprisonment." Id. at 389; see also Abreu-Guzmán v. Ford, 241 F.3d 69, 75 (1st Cir. 2001) (noting that, "[u]nder Puerto Rico law, false arrest and false imprisonment claims share identical elements").

submission had been untimely and the latter because Paret was arrested and held pursuant to legal process. See Wallace v. Kato, 549 U.S. 384, 389 (2007) (stating that the tort of false imprisonment, which embraces false arrest, involves "detention without legal process").

The court also rejected the malicious prosecution claim. Again at the civil trial, Paret admitted telling González and the FBI informant that he had been involved in numerous drug activities, but this time explained that he fabricated his ongoing drug ventures because he was drunk and to induce the pair to give him money. He claimed that the informant, Lázaro Herrera, initiated the interactions by coming to his door purporting to need help with flat tires, and thereafter repeatedly asked Paret to join in various criminal activities. When asked why he kept up the charade with police officers if, as he asserted, he knew they were trying to entrap him, Paret again referred to the police plot he had invoked at his criminal trial: "This was a persecution that mutated into a prosecution because since the Puerto Rico police could not do anything, they then sent it to the Federal government." Pressed further to explain, he said he "believed that when it came to trial everything would come to light," but then, at trial, he "didn't understand the situation, and so [he] . . . missed the opportunity to explain to the jury what was really happening."

González, meanwhile, emphasized that his training and experience led him to conclude that Paret was "a legitimate trafficker." He explained:

> I had no doubt. And today I have no doubt that I was dealing with a legitimate drug smuggler. . . . All the prices, the routes, the amounts, all the details that he was giving were extremely clear and consistent with that of an experienced drug smuggler. . . .
>
> So we continued with the investigation. In DEA we discussed this as we went on and we kept corroborating that in fact we had an interesting investigation and solid investigation to pursue . . . .
>
> Mr. Paret kept bringing up meetings that he had with those, at the time unidentified subjects and called me on several occasions telling me I am meeting with these guys right now, I am meeting with the subjects right now we need to see the boat again, etcetera. So several times he indicated to me clearly that he was just not making it up. He was definitely pursuing this drug smuggling operation.

In evaluating the testimony, the district court saw little evidence of an actual conspiracy: "At the end of the day, the Government offered nothing, beyond Paret's own statements, that even hinted that he might be 'the real deal.'" 2014 WL 4729122, at *2. On the other hand, the court "discredit[ed] much of Paret's self[-]serving testimony." Id. In addition, although doubting that Paret intended to import drugs with González, the court found it "easy to understand why Agent González believed in Paret's

- 13 -

seriousness."  Id.  The court concluded its findings of fact as follows: "Put bluntly, there was no reason to think that Agent González knew Paret was lying, much less that he was investigating Paret for any impermissible purpose."  Id.

On the basis of that finding -- in essence, that González pursued Paret in good faith -- the court held that Paret could not establish the required element of malice to support his malicious prosecution claim.  "At most," the court stated, González "might have misinterpreted some of his conversations with Paret -- or been misled by Herrera -- but neither of those occurrences, even if true, would support a finding of bad faith."  Id. at *4.

The district court thus entered judgment for the United States on all of Paret's claims.  On appeal, Paret challenges only the rejection of his malicious prosecution and forfeiture-related claims.[10]

---

[10] In his brief, Paret refers to the false imprisonment claim when describing the issues presented for review, but he offers no argument directed to that claim.  That issue is therefore waived.

- 14 -

## II. Legal Analysis

### A. Forfeiture

Generously construed, Paret's complaint appears to challenge the forfeiture of his trucks and boat as both an unconstitutional taking and a tortious deprivation of property.[11] The district court accepted that two-pronged approach and addressed both claims. It dismissed the constitutional cause of action as untimely, but allowed the statutory (i.e., FTCA) tort claim to proceed to trial. Post-trial, however, the court concluded that the FTCA cannot provide Paret a remedy because "[f]iling a claim under § 983 is the <u>exclusive</u> avenue for seeking a judicial determination in an administrative forfeiture case." 2014 WL 4729122, at *5.

In rejecting Paret's property claims, the district court considered only the administrative, and not the criminal, forfeiture. Noting that Paret's post-trial brief had conflated the two, the court explained that "it is only th[e] administrative forfeiture proceeding that Paret is challenging." <u>Id.</u> at *4. The court pointed out that the order setting $20,000 as the <u>criminal</u> forfeiture amount did not encompass the vehicles. <u>Id.</u> Moreover,

---

[11] Although Paret's complaint invokes jurisdiction only under the FTCA, he links his takings claim to the Fifth Amendment. <u>See</u> Compl. ¶ 49 ("Plaintiff seeks compensation in respect of the government's taking of his property, and tortious actions that are tied to the purpose and self-executing aspects of the Just Compensation Clause of the Fifth Amendment.").

- 15 -

the criminal forfeiture had been vacated along with Paret's conviction, and Paret was no longer subject to the $20,000 penalty. Id.

Notwithstanding the district court's explanation, Paret continues on appeal to blend the administrative and criminal forfeiture proceedings. He concedes that he did not comply with the requirements for disputing a civil forfeiture, but he seeks to sidestep that default in part by relying on the invalidity of the criminal forfeiture. At oral argument, his attorney opaquely stated that "we're not contesting the civil forfeiture to the extent that the damages were also caused in the criminal forfeiture in the taking of his property." So far as we can tell, Paret's premise is that, notwithstanding the finality of the civil forfeiture, he may seek a remedy for the loss of his vehicles because the same deprivation of property was implicated in the criminal forfeiture.

That premise is patently incorrect. As the district court observed, the criminal forfeiture order was necessarily vacated along with Paret's convictions on the substantive counts as it depended upon the conviction. At oral argument, government counsel reported that the $20,000 judgment was never satisfied, and Paret does not contend otherwise. However, as described above, civil forfeiture may proceed irrespective of the outcome of related criminal charges. The record shows no connection between the

forfeited vehicles -- whose combined value Paret estimates at $85,000 -- and the vacated, unfulfilled $20,000 criminal forfeiture order.  In short, Paret's loss of property has nothing to do with the criminal forfeiture, and the civil forfeiture is necessarily the only one at issue in this appeal.

As to the administrative forfeiture, Paret offers various arguments about the viability of his deprivation-of-property claim in both its statutory and constitutional forms.  However, his contentions rely on a single underlying theory: the government owes him compensation because he ultimately was acquitted of the alleged criminal activity that led to the government's seizure of his property.  In his view, he is entitled to a remedy for the "wrongful" forfeiture of his vehicles.

The problem with Paret's theory is that the forfeiture of his property adhered to the statutory scheme Congress enacted.  As described above, § 983 specifies a procedure for objecting to the seizure of property for the purpose of civil forfeiture, but Paret did not complete that process.  The statute also provides a post-forfeiture remedy for a property owner who did not receive notice,[12]

_____

[12] Section 983(e) states, in relevant part:

> (1) Any person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect

- 17 -

but Paret cannot claim lack of notice because he responded -- albeit imperfectly -- to the notice he received.[13]  Moreover, as the district court noted, Congress has expressly precluded other rationales for relief from forfeiture: "A motion filed under this subsection [relating to notice] shall be the exclusive remedy for seeking to set aside a declaration of forfeiture under a civil forfeiture statute."  18 U.S.C. § 983(e)(5).

Notwithstanding this explicit limitation, Paret looks to sources that more generally provide remedies for governmental deprivations of property, i.e., the FTCA and the Constitution.  Yet he does not explain why he should be able to obtain relief outside § 983 when Congress has expressly conditioned relief from

---

> to that person's interest in the property, which motion shall be granted if--
>
> (A) the Government knew, or reasonably should have known, of the moving party's interest and failed to take reasonable steps to provide such party with notice; and
>
> (B) the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim.

18 U.S.C. § 983(e).  A motion under this section "may be filed not later than 5 years after the date of final publication of notice of seizure of the property."  Id. § 983(e)(3).

[13] As detailed above, Paret's second attempt to file a proper claim was untimely.  The magistrate judge observed that some courts have recognized the possibility of equitable tolling in the context of § 983, but Paret has not argued such a theory.

civil forfeiture on circumstances that do not apply to him.  Paret does not claim that the forfeiture of his vehicles violated § 983, and he does not challenge the constitutionality of the civil forfeiture scheme itself.  Hence, § 983 bars his claim to compensation.[14]

Indeed, as we explain below, the unavailability of relief is reinforced by direct examination of Paret's FTCA and constitutional claims.

### 1.  FTCA Claim

The FTCA by its terms disallows Paret's claim.  The statute permits claims based on the seizure of property for the purpose of forfeiture only if "the interest of the claimant was not forfeited."  28 U.S.C. § 2680(c) (listing four prerequisites for such a claim).  Because Paret did not submit a timely claim under § 983(a)(2) or obtain relief from forfeiture under § 983(e), his interest in the vehicles was forfeited, and his FTCA claim therefore fails.[15]

---

[14]  Paret's complaint contains an unelaborated allegation that his "interest in the forfeited property . . . was sufficiently significant and the circumstances were such that the notice given by the Government did not comport with the requirements of due process."  See Compl. at ¶ 54.  Although this allegation could suggest a Fifth Amendment procedural due process claim contesting the adequacy of the forfeiture scheme as applied to him, Paret did not develop such a claim.  His constitutional argument on appeal is based solely on a takings theory.

[15]  Moreover, Paret's claim appears to be beyond the scope of the FTCA.  The statute waives sovereign immunity for damages claims

- 19 -

## 2. Constitutional Takings Claim

Paret's constitutional cause of action does not fare any better. Prominent among Paret's contentions is that the district court erred in dismissing his constitutional claim as time-barred based on a one-year statute of limitations. He argues that the court should have borrowed the six-year limitations period of the Tucker Act. See 28 U.S.C. §§ 1491(a)(1), 2501. Although Paret correctly notes the relevance of the Tucker Act, he is mistaken about its application here.

The Tucker Act is the constitutional analogue to the FTCA. That is, like the FTCA, which waives sovereign immunity for tort claims against the federal government, the Tucker Act waives sovereign immunity for constitutional claims against the United States. See 28 U.S.C. § 1491(a)(1). Indeed, we have noted that a claim under the Tucker Act is the "applicable procedure" for asserting a takings claim against the federal government. Asociación de Subscripción del Seguro de Responsabilidad

---

based on conduct (or inaction) of government employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). Because forfeiture is a uniquely governmental procedure, the resulting loss of property does not arise from circumstances in which a private person could be liable. Cf., e.g., Ali v. Fed. Bureau of Prisons, 552 U.S. 214 (2008) (addressing prisoner's FTCA claim concerning personal items that went missing after he and his property were transferred from one federal prison to another).

Obligatorio v. Flores Galarza, 484 F.3d 1, 16 (1st Cir. 2007). Paret's particular claim, however, appears to fall outside the Tucker Act waiver.

Sovereign immunity protects the United States from suit absent consent that is "unequivocally expressed." United States v. Bormes, 133 S. Ct. 12, 16 (2012) (internal quotation marks omitted). As a general matter, the Tucker Act provides the necessary consent for, inter alia, "any claim against the United States founded . . . upon the Constitution." 28 U.S.C. § 1491(a)(1).[16] Notwithstanding that broad language, "[t]he Tucker Act has been held inapplicable where Congress has provided alternative remedies under other statutes." Abreu v. United States, 468 F.3d 20, 30 (1st Cir. 2006). This is so because the Tucker Act is "simply [a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law." Bormes, 133 S. Ct. at 17 (quoting United States

---

[16] The Tucker Act and its "companion statute," the Little Tucker Act, 28 U.S.C. § 1346(a)(2), both "provide[] the Federal Government's consent to suit for certain money-damages claims." Bormes, 133 S. Ct. at 16. The Little Tucker Act gives district courts "original jurisdiction, concurrent with the United States Court of Federal Claims," for, inter alia, constitutional claims "not exceeding $10,000 in amount," 28 U.S.C. § 1346(a)(2), while the Tucker Act gives jurisdiction to the Court of Federal Claims "regardless of monetary amount," Bormes, 133 S. Ct. at 16 n.2. The Court of Federal Claims thus has exclusive jurisdiction over Tucker Act claims exceeding $10,000. See United States v. Hohri, 482 U.S. 64, 72 (1987) ("Tucker Act claims for more than $10,000 may be brought only in the United States Claims Court.").

v. Navajo Nation, 556 U.S. 287, 290 (2009)).  Hence, if the law on which a claim is premised contains its own, more limited, judicial remedies, "[t]he Tucker Act is displaced."  Id. at 18.

In Bormes, the Supreme Court considered the availability of a Little Tucker Act claim based on the Federal Credit Reporting Act ("FCRA").  The Court observed that the FCRA "'set[s] out a carefully circumscribed, time-limited, plaintiff-specific' cause of action" and also identifies the forum for such claims.  Id. at 19 (quoting Hinck v. United States, 550 U.S. 501, 507 (2007)). This "self-executing remedial scheme," the Court concluded, "supersedes the gap-filling role of the Tucker Act" in providing a remedy for an asserted FCRA violation.  Id. at 18.

The civil forfeiture scheme at issue in this case is similarly specific.  Congress has authorized the seizure and forfeiture of particular types of property, see 21 U.S.C. § 881(a); 18 U.S.C. § 983, provided property owners a means to obtain review of a challenged seizure in district courts, see 18 U.S.C. § 983(a)(2)-(4), and specified that relief from forfeiture is available only based on absence of notice, see id. at § 983(e)(5).  Arguably, then, as in Bormes, the Tucker Act is displaced by a "self-executing remedial scheme."  Bormes, 133 S. Ct. at 18.

Paret, of course, relies on the Constitution, not the forfeiture statute itself, in asserting an unlawful taking of his property.  Yet, the question necessarily remains whether the Tucker

- 22 -

Act waives the United States' sovereign immunity for his claim, and Congress's chosen remedies remain relevant in ascertaining the answer.  To allow a constitutional takings claim of the sort Paret seeks to bring arguably would "frustrate congressional intent with respect to the specific remedial scheme already in place."  Bormes, 133 S. Ct. at 18; see also Mesa Valderrama v. United States, 417 F.3d 1189, 1195 (11th Cir. 2005) (stating that "a party seeking to challenge a nonjudicial forfeiture that falls within CAFRA's purview is limited to doing so under 18 U.S.C. § 983(e)"); Vereda, Ltda. v. United States, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (stating that the "statutory scheme evinces Congress' intent to preempt any Tucker Act jurisdiction over a money claim that challenges the propriety of an in rem administrative forfeiture of property seized under 21 U.S.C. § 881").  Hence, the fact that Paret premised his claim on the Constitution, rather than § 983 itself, makes no difference to the Tucker Act analysis.

We need not -- and, indeed, should not -- say more on the applicability of the Tucker Act.  Even if a constitutional takings claim could somehow survive the "exclusive" remedy provided by the forfeiture statute, Paret's claim cannot succeed because it was improperly brought in the district court and improperly appealed to us.  As noted above, the Court of Claims has exclusive jurisdiction for constitutional claims against the United States exceeding $10,000.  See supra note 16.  We thus "have no

- 23 -

jurisdiction to consider a taking claim where the amount in controversy exceeds" that amount. Hammond v. United States, 786 F.2d 8, 15 (1st Cir. 1986); see also Knott v. FERC, 386 F.3d 368, 374 (1st Cir. 2004). Paret sought a total of $585,000 in damages, of which $85,000 was for the loss of the trucks and boat. Accordingly, the Tucker Act's six-year statute of limitations has no role to play here.[17]

In sum, Paret's opportunity for a remedy in district court resided solely in the provisions of § 983. His failure to comply with that statute's requirements precludes the challenge he brings here to the forfeiture of his trucks and boat.[18]

---

[17] In addition to the constitutional claims allowed pursuant to the Tucker Acts, federal courts may address claims asserting violations of the United States Constitution by federal actors when they are brought against individual officers. See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Paret, however, has expressly waived any claim under Bivens. See Appellant's Br. at 23.

[18] In finding no basis for relief on the property claims, the district court expressed its view that "the result is unjust." 2014 WL 4729122, at *5. The court stated that Paret's inability to seek the return of a substantial amount of property despite "the fact of his acquittal and the lack of nexus between the property and the 'crime' of which Paret was acquitted," "suggests that the civil asset forfeiture system may be broken." Id. at *5 n.10. The court's comments reflect an ongoing controversy, with opponents assailing "[t]he widespread failure of civil forfeiture laws to protect property owners from unjust forfeitures." Dick M. Carpenter II et al., Policing for Profit: The Abuse of Civil Asset Forfeiture 43 (Institute for Justice 2d ed. 2015); see also id. at 24 & nn. 77, 78 (noting 2015 introduction in the House and Senate of the Fifth Amendment Integrity Restoration (FAIR) Act, which, among other provisions, would increase the government's burden of proof in § 983 forfeiture

**B. Malicious Prosecution**

Under Puerto Rico law, a plaintiff must prove four elements to succeed on a claim of malicious prosecution: (1) the defendant "initiated or instigated" a criminal action, (2) the action terminated in favor of the plaintiff, (3) the defendant acted with malice and without probable cause, and (4) the plaintiff suffered damages.  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011).  "For purposes of malicious prosecution, Puerto Rico courts equate malice with bad faith."  Id. at 59.

As described above, the district court concluded that Paret had failed to prove malice, the only element disputed by the government.  Paret challenges that conclusion, arguing that Agent González manifested bad faith by falsely telling the grand jury he had evidence of Paret's participation in a drug trafficking conspiracy.  Paret asserts that González could prove only that Paret interacted with government agents (i.e., González and the FBI informant, Herrera) about importing drugs, not with other culpable actors, and González thus had an inadequate factual basis to seek an indictment.  See Paret-Ruiz, 567 F.3d at 6 (stating that, "as a matter of law, there can be no conspiracy between a defendant and a government agent").

---

proceedings from a preponderance of the evidence to clear and convincing evidence).

We review a district court's findings after a bench trial for clear error, "'giv[ing] due regard to the trial court's opportunity to judge the witnesses' credibility.'" González-Rucci v. INS, 539 F.3d 66, 69 (1st Cir. 2008) (quoting Fed R. Civ. P. 52(a)(6)). That deference proves fatal to Paret's claim. The district court rejected much of Paret's "self[-]serving testimony," but found González credible. 2014 WL 4729122, at *2; see also id. at *4 ("[T]he evidence at trial suggested that Agent González honestly believed -- and believes -- that Paret is a drug trafficker."). Although the court noted the lack of evidence -- beyond Paret's own boasting -- that he was "'the real deal,'" it found no indication that González disbelieved Paret's accounts of potential drug smuggling ventures. Id. at *2.

This is a permissible view of the evidence. Regardless whether Paret was merely "playing the undercover agents for their money," as he claims, he nonetheless offered facially plausible details about imminent drug smuggling ventures in an effort to persuade González and Herrera that he was a legitimate drug trafficker looking for a boat to pick up loads of cocaine for transport to Puerto Rico. During one of their meetings, González heard Paret's end of a phone call with Santana about the acquisition of a boat, which was consistent with Paret's focus on

procuring a vessel for drug shipments.[19]  On this record, the district court certainly cannot be faulted for crediting González's testimony that Paret's deception -- if that is what it was -- succeeded.

This court's previous decision vacating Paret's drug conspiracy conviction does not point to a different outcome.  We deemed the case "close" in a context that required proof of Paret's guilt beyond a reasonable doubt, a higher degree of certainty than the probable cause standard applicable to the charging decision.  Paret-Ruiz, 567 F.3d at 7.  Moreover, we do not assess witness credibility when we evaluate the sufficiency of the evidence in a criminal case, id. at 5, but the factfinder's credibility assessment in a civil trial, as noted above, holds weight, see Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 138-39 (1st Cir. 2006) ("[I]f the trial court's reading of the record [with respect to an actor's motivation] is plausible, appellate

---

[19] Repeating the assertion he made in the criminal trial that he had only spoken by phone with Santana about a horse, Paret testified in the civil case that the call he made to Santana in González's presence was about "the horse that [Santana] had shown me."  Given the surrounding circumstances, the district court could reasonably find otherwise.  Indeed, in questioning González about that call in the civil case, Paret's attorney accepted that the overheard conversation was about a boat and focused on whether the pertinent coded language referred to a vessel owned by Paret or to a DEA undercover vessel.

review is at an end." (second alteration in original) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996))).

Having confirmed that the credibility judgment in this instance finds support in the record, we discern no clear error in the district court's determination that González did not act in bad faith and, hence, that Paret failed to prove the malice element of his malicious prosecution claim.

## III. Conclusion

Paret's forfeiture-based claim was properly dismissed because he has no remedy under the FTCA and the district court had no jurisdiction to consider his constitutional takings claim. Paret's challenge to the district court's rejection of his malicious prosecution claim also fails, as we detect no clear error in the court's finding that González did not act maliciously in pursuing the drug conspiracy indictment. Judgment for the government on each of these claims is therefore affirmed.

So ordered.